[972 NE2d 87, 948 NYS2d 846]

In the Matter of HAILEY ZZ., a Child Alleged to be Permanently Neglected. TOMPKINS COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; RICKY ZZ., Appellant.

Argued May 1, 2012; decided June 7, 2012

**POINTS OF COUNSEL**

*Paul J. Connolly*, Delmar, for appellant. I. Because Tompkins County Department of Social Services did not prove by clear and convincing evidence that it exercised diligent efforts to encourage and strengthen appellant's relationship with his child, or that appellant failed to plan for his child, Supreme Court should have dismissed the petition. (*Matter of Gregory B.*, 74 NY2d 77; *Matter of Star Leslie W.*, 63 NY2d 136; *Matter of Jamie M.*, 63 NY2d 388; *Matter of Sheila G.*, 61 NY2d 368; *Matter of Lawrence KK. [Lawrence LL.]*, 72 AD3d 1233, 14 NY3d 713; *Santosky v Kramer*, 455 US 745; *Matter of Natasha RR.*, 42 AD3d 769, 9 NY3d 812; *Matter of Joseph Jerome H.*, 224 AD2d 224; *Matter of Antonio EE. v Schoharie County Dept. of Social*

*Servs.*, 38 AD3d 944, 8 NY3d 813; *People v Greaves*, 94 NY2d 775.) II. If appellant's Supreme Court attorney failed to preserve the issues raised in point I, then appellant was denied his constitutional and statutory right to the effective assistance of counsel. (*Matter of Deon M. [Vernon B.]*, 68 AD3d 1740; *Matter of Evan F.*, 29 AD3d 905; *Matter of Eileen R. [Carmine S.]*, 79 AD3d 1482; *Henry v Poole*, 409 F3d 48; *Matter of Matthew C.*, 227 AD2d 679; *Matter of Brenden O.*, 20 AD3d 722; *Matter of State of New York v Campany*, 77 AD3d 92, 15 NY3d 713; *People v Turner*, 5 NY3d 476; *People v Caban*, 5 NY3d 143.) III. The courts below erred in concluding that Supreme Court had no authority to order posttermination contact between appellant and his child. (*Matter of Gregory B.*, 74 NY2d 77; *Matter of McDevitt*, 176 App Div 418, 221 NY 598; *Matter of Dana Marie E.*, 128 Misc 2d 1018; *Matter of Anthony*, 113 Misc 2d 26; *Matter of Raana Beth N.*, 78 Misc 2d 105; *People ex rel. Sibley v Sheppard*, 54 NY2d 320; *Matter of Scranton v Hutter*, 40 AD2d 296; *Matter of Delores B.*, 141 AD2d 100; *Matter of Jacob*, 86 NY2d 651; *Matter of Stephen B.*, 176 AD2d 1204, 79 NY2d 752, 914.)

*Daniel S. Feder*, Ithaca, for respondent. I. The trial court properly ordered termination of appellant's parental rights. (*Matter of Lawrence KK. [Lawrence LL.]*, 72 AD3d 1233, 14 NY3d 713; *Matter of Gregory B.*, 74 NY2d 77; *Matter of Star Leslie W.*, 63 NY2d 136; *Matter of Nathaniel T.*, 67 NY2d 838; *Matter of Irene O.*, 38 NY2d 776; *Matter of Laelani B.*, 59 AD3d 880; *Matter of Tennant v Philpot*, 77 AD3d 1086; *Matter of Bronson v Bronson*, 63 AD3d 1205; *Matter of Kaiden AA. [John BB.]*, 81 AD3d 1209.) II. Appellant received effective assistance of counsel. (*Matter of Gerald BB.*, 51 AD3d 1081.) III. Posttermination visitation was properly denied. (*Matter of Van Berkel v Power*, 16 NY2d 37; *People v Baumann & Sons Buses, Inc.*, 6 NY3d 404; *Lanz v Feola*, 181 AD2d 1053; *Matter of Carter v Carter*, 58 AD2d 438; *People v Michael C.*, 27 NY2d 79; *Santosky v Kramer*, 455 US 745; *Matter of Jacob*, 86 NY2d 651; *Matter of Gregory B.*, 74 NY2d 77; *Lassiter v Department of Social Servs. of Durham Cty.*, 452 US 18; *Matter of McDevitt*, 176 App Div 418.)

*O'Connor & Kruman, P.C.*, Cortland (*Randolph V. Kruman* of counsel), Attorney for the Child. I. Supreme Court properly determined that Tompkins County Department of Social Services proved by clear and convincing evidence that appellant failed to plan for the future of the child. (*Matter of Charles Frederick Eugene M.*, 171 AD2d 343; *Matter of Gregory B.*, 74

NY2d 77.) II. Supreme Court properly denied appellant's request for a suspended judgment. (*Matter of Love Russell J.*, 7 AD3d 799.) III. Supreme Court properly denied appellant's request for posttermination visitation. (*Matter of Jessi W.*, 20 AD3d 620; *Matter of Shane J. v Cortland County Dept. of Social Servs.*, 305 AD2d 751; *Matter of Melissa DD.*, 45 AD3d 1219; *Matter of John KK.*, 34 AD3d 1050.) IV. Posttermination visitation is not in the child's best interest.

*Legal Aid Bureau of Buffalo, Inc.*, Buffalo (*Russell E. Fox, David C. Schopp* and *Pamela L. Neubeck* of counsel), for Legal Aid Bureau of Buffalo, Inc., amicus curiae. Family Court's discretion to consider whether posttermination visitation is in a child's best interest should not be curtailed. (*Matter of Jessica Marie Q.*, 303 AD2d 512; *Matter of Corinthian Marie S.*, 297 AD2d 382; *Matter of Kahlil S.*, 35 AD3d 1164, 8 NY3d 977; *Matter of McDevitt*, 176 App Div 418, 221 NY 598; *Matter of Gregory B.*, 74 NY2d 77; *Stanley v Illinois*, 405 US 645.)

*William K. Taylor, County Attorney*, Rochester (*Peter A. Essley* of counsel), for Monroe County Department of Social Services, amicus curiae. I. The trial court properly ordered termination of appellant's parental rights. (*Matter of Sheila G.*, 61 NY2d 368; *Matter of Roderick W.*, 96 AD2d 746; *Matter of Jamie Y.*, 92 AD2d 696; *Matter of Janet AA.*, 88 AD2d 670; *Matter of Lisa Ann U.*, 75 AD2d 944; *Matter of Star Leslie W.*, 63 NY2d 136; *Matter of Michael B.*, 80 NY2d 299; *Matter of Cheyanne V.*, 55 AD3d 1383.) II. The trial court properly denied posttermination visitation. (*Matter of Gregory B.*, 74 NY2d 77; *Matter of Jacob*, 86 NY2d 651; *Matter of Cheyanne M.*, 299 AD2d 162; *Matter of Mia T. [Emilio T.]*, 88 AD3d 730; *Matter of Best*, 66 NY2d 151; *Matter of Murphy*, 6 NY3d 36; *Matter of Joyce T.*, 65 NY2d 39; *Matter of Kahlil S.*, 35 AD3d 1164; *Jones v Beame*, 45 NY2d 402; *Kleila v Kleila*, 50 NY2d 277.)

*Stephen M. Dorsey, County Attorney*, Ballston Spa (*Karen E.S. D'Andrea* of counsel), and *Roger A. Wickes, County Attorney*, Fort Edward (*Daniel S. Martindale* of counsel), for Saratoga County Department of Social Services and another, amici curiae. I. Children in foster care are entitled to real and final permanency. (*Matter of Gregory B.*, 74 NY2d 77.) II. A statutory scheme for posttermination contact already exists via judicial or extrajudicial surrender. (*Matter of Alexandra C.*, 157 Misc 2d 262; *Matter of Christopher F.*, 260 AD2d 97; *Matter of April S.*, 307 AD2d 204; *Matter of Xionia VV. [Amos VV.]*, 78 AD3d 1452;

*Matter of Selena C. [Thelma C.]*, 77 AD3d 659; *People ex rel. Sibley v Sheppard*, 54 NY2d 320.) III. A failure to provide the biological parent with posttermination contact after a contested proceeding is not a denial of due process. (*Matter of April S.*, 307 AD2d 204; *Matter of Alex MM.*, 260 AD2d 675; *Matter of Israel R.*, 200 AD2d 498; *Matter of Lovell Raeshawn McC.*, 308 AD2d 589; *Matter of Joyce T.*, 65 NY2d 39; *Matter of Demariah A. [Rebecca B.]*, 71 AD3d 1469; *Matter of Michael E.*, 241 AD2d 635; *Matter of Nereida S.*, 57 NY2d 636; *Matter of Joshua BB.*, 27 AD3d 867; *Matter of Dionne W.*, 267 AD2d 1096.)

## OPINION OF THE COURT

READ, J.

This appeal calls upon us to resolve a conflict within the Appellate Division as to whether Family Court may direct continuing contact between parent and child once parental rights have been terminated pursuant to Social Services Law § 384-b. We hold that the court lacks this authority.

### I.

Hailey ZZ., born in late 2007, initially resided with her birth mother and father and an older half-sister, a child of Hailey's mother and a different father. Father was sentenced to 5 to 15 years in prison in early 2008, when Hailey was three months old, and has apparently remained incarcerated ever since. On November 5, 2008, the Tompkins County Department of Social Services (DSS), effecting a removal under section 1024 of the Family Court Act, took Hailey and her half-sister away from their mother. The girls were placed in DSS's custody to reside with certified foster parents.

On March 26, 2010, DSS filed petitions against both parents, seeking orders adjudicating Hailey to be permanently neglected, terminating parental rights and committing her guardianship and custody to DSS (*see* Social Services Law § 384-b; Family Ct Act § 614). On July 23, 2010, Hailey's mother surrendered her parental rights and signed a postadoption visitation agreement (*see* Social Services Law § 383-c). DSS withdrew its petition against mother, and proceeded with the fact-finding hearing against father (Family Ct Act § 622).

In a decision and order entered on August 12, 2010, Supreme Court[1] first determined that DSS had made the requisite diligent efforts to encourage and strengthen the parental relationship by maintaining regular contact with father after Hailey's placement in November 2008, insuring monthly visitations, requesting the necessary information to plan for the child's care and investigating the individuals whom father suggested to be Hailey's caretakers. He noted that DSS's diligent efforts "overcame as many barriers" posed by father's incarceration "as possible to assist [him] in reuniting with the child."

Next, Supreme Court determined that father had failed to plan for Hailey's future for more than one year after she came under DSS's care. The judge acknowledged that father had maintained contact with Hailey and DSS and had participated in various prison programs, but opined that this was insufficient. He observed that father was not likely to be released from prison until June 2011 at the earliest, and more likely later, possibly not until 2018; that once released, father would "have to obtain suitable housing and address some parenting issues prior to gaining placement of the child"; and that Hailey had already been in foster care for 20 months and "need[ed] to achieve permanency."

As a result of these circumstances, Supreme Court concluded that father's "only alternative [was] to come up with a plan for the care of [Hailey] until he [was] able to resume custody." The judge concluded that father failed to do this because the family members or others whom he proposed to care for Hailey were uniformly unsuitable: his father had a "lengthy history" with DSS, and one sister had such a "history" as well; father "admitted" that neither would be an "appropriate" custodian; the other sister was fired from her job as a health aide after being accused of elder abuse;[2] and his girlfriend of seven months and the distant relatives whom he identified barely knew Hailey, and "there [was] no indication whatsoever that they [were] interested or appropriate." Accordingly, Supreme Court adjudicated Hailey to be permanently neglected and ordered the requisite dispositional hearing (see Family Ct Act §§ 623, 625).

---

1. This matter was transferred from Family Court to Supreme Court and referred to Supreme Court's Integrated Domestic Violence Part, where it was handled by a Family Court judge designated an acting Supreme Court justice.

2. Father testified that this sister, the 26-year-old single mother of a two-week-old infant at the time, was living with their 71-year-old grandmother.

In a decision and order entered on October 29, 2010 after the dispositional hearing, Supreme Court considered whether it was in Hailey's best interests to terminate father's parental rights and commit guardianship to DSS, or, alternatively, suspend judgment.[3] The judge remarked that father had been in prison "during the entire period" of Hailey's foster care—two thirds of her life—and that once released, would still need to obtain stable housing and "possibly engage in other services[ ] before the child could be returned to his care." He concluded that it was in Hailey's best interests to terminate father's parental rights and free her for adoption so as to achieve permanency.

Additionally, Supreme Court denied father's request for *continuing visitation with Hailey.* Father cited several Fourth Department cases to support the availability of this option. The judge noted, though, that Third Department precedent did not allow for a court to mandate continuing contact between a parent and child after parental rights had been terminated pursuant to Social Services Law § 384-b. He added that such contact would, in any event, not be in Hailey's best interests as there was no evidence of any emotional or lasting connection between Hailey and father; indeed, they had spent only about 72 hours together in two years' time, or the equivalent of 3 out of 730 days. Nor was there evidence to show whether Hailey's potential adoptive parents "would be receptive to future visitation for [father]," or, if this adoption fell through, whether such a requirement "would discourage other potential adoptive parents." In sum, Supreme Court ruled it was in Hailey's best interests to terminate father's parental rights, without posttermination visitation "even if the Third Department allowed [it]," rather than suspend judgment. Father appealed.

The Appellate Division affirmed, concluding that the evidence supported Supreme Court's finding that DSS "made the requisite diligent efforts"; and there was "no basis to disturb the [judge's] conclusion that [father] failed to plan for the child's future" (85 AD3d 1265, 1266 [3d Dept 2011]). The Appellate Division also determined that the record supported Supreme Court's

---

**3.** A suspended judgment is intended to provide an opportunity—in effect, a second chance—for reunification of parent and child. Thus, the court may suspend judgment for up to one year after a finding of permanent neglect has been made, subject to an extension for an additional year in the event of exceptional circumstances (*see* Family Ct Act § 633).

"finding that, instead of remaining in foster care on a long-term basis while [father] remains incarcerated, it is in the child's best interests to be freed for adoption by the foster parents, who have expressed a willingness to adopt [Hailey] and her half sister, to whom she is closely bonded" (*id.* at 1266-1267).[4]

Further, "the request for posttermination visitation was properly denied as unavailable in a contested termination proceeding" (*id.* at 1267). We granted father leave to appeal (17 NY3d 709 [2011]), and now affirm.

## II.

An authorized agency that brings a proceeding to terminate parental rights based upon permanent neglect bears the burden of establishing that it has made "diligent efforts to encourage and strengthen the parental relationship" (Social Services Law § 384-b [7] [a]; *see Matter of Sheila G.*, 61 NY2d 368, 380-381 [1984]). "Those efforts must include counseling, making suitable arrangements for visitation, providing assistance to the parents to resolve or ameliorate the problems preventing discharge of the child to their care and advising the parent at appropriate intervals of the child's progress and development" (*Matter of Star Leslie W.*, 63 NY2d 136, 142 [1984]; *see* Social Services Law § 384-b [7] [f]).

Once diligent efforts have been established, the agency must prove that the parent has permanently neglected the child, as defined in Social Services Law § 384-b (7) (a), by

"fail[ing] for a period of [more than one year] following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child."

---

4. At the fact-finding hearing, father testified that although he did not want to separate Hailey from her half-sister, he nonetheless "[did not] think that [his] rights should be taken away from [him] because they want to be placed together." Similarly, father acknowledged that his desire to retain parental rights, or at least not to surrender them without far more visitation than DSS proposed, was "about [his] feelings" since Hailey was "the only kid [he had]" and he was "going to be in jail probably the next year or so."

Further, at the ensuing dispositional hearing the court must consider only the best interests of the child involved, which is essentially a factual determination (*see Matter of Star Leslie W.*, 63 NY2d at 147-148).

Father argues that DSS did not prove by the required clear and convincing evidence that it exercised diligent efforts, or that he failed to plan for Hailey. Thus, he contends, Supreme Court should have dismissed the permanent neglect petition. But DSS established that it arranged visitation for father, communicated with him regarding service plans and Hailey's progress and investigated various relatives proposed as resources for placement. And as we emphasized in *Matter of Gregory B.* (74 NY2d 77, 89-90 [1989]), while the Legislature in Social Services Law § 384-b (7)

> "acknowledged the 'special circumstances' of an incarcerated parent . . . [t]his does not mean . . . that the Legislature intended to approve a plan of indefinite foster care for the child of an incarcerated parent who is serving a lengthy prison term and who cannot provide the child with an alternative living arrangement. Although the statutory scheme favors keeping a child with the natural parent where practicable and stresses the importance of exercising diligent efforts to foster and maintain the cohesiveness of the family unit, permanence in a child's life also has been given a priority, because the Legislature has determined that a normal family life in a *permanent* home offers the best opportunity for a child to develop and thrive. Thus, . . . a primary purpose of the statute is to provide a fair and timely basis to free a child for adoption and that [w]hen it is clear that natural parents cannot offer a normal home for a child, and continued foster care is not an appropriate plan, the statute directs that a permanent home be sought" (internal quotation marks and citation omitted; *see also Matter of Michael B.*, 80 NY2d 299, 310 [1992] ["Extended foster care is not in the child's best interest, because it deprives a child of a permanent, nurturing family relationship"]).

■ We may review findings of fact, reached by the trial court under the proper evidentiary standard and affirmed by the Appellate Division, only to determine whether they enjoy support in the record (*Matter of Star Leslie W.*, 63 NY2d at 147). Here,

the evidence backs up Supreme Court's affirmed findings that DSS exercised diligent efforts, and that for a period of more than a year father failed to plan for Hailey's future in a "realistic and feasible" way (*see* Social Services Law § 384-b [7] [c]). As amicus curiae Monroe County Attorney put it, "[e]ffectively, [father's] plan for [Hailey] was to let the county care for her in foster care until he got out of prison . . . , at which time he would start the hard work to get the child back" (*see Matter of Gregory B.*, 74 NY2d at 89 [statutory reforms precluding termination of parental rights based solely on the fact of incarceration "were in no way intended to excuse incarcerated parents from the requirement that they plan for their child's future"]). In short, the record supports the judge's determinations adjudicating Hailey a permanently neglected child and terminating father's parental rights, thus freeing Hailey for adoption.

## III.

In the event we decide that his parental rights were properly terminated—as we have—father contends that the lower courts wrongly decided that the hearing court lacked authority to grant him posttermination contact with Hailey. He therefore asks us to remit this matter to the Appellate Division for its review of Supreme Court's alternative ruling that posttermination visitation would not be in Hailey's best interests.

The Fourth Department has held that Family Court is authorized to award posttermination contact where parental rights have been terminated pursuant to Social Services Law § 384-b. In *Matter of Kahlil S.* (35 AD3d 1164 [4th Dept 2006], *lv dismissed* 8 NY3d 977 [2007]), the court upheld termination of the mother's parental rights with respect to her two children, Kahlil S. and Terrell Z., on the ground that she presently and for the foreseeable future was unable, by reason of mental illness, to provide proper and adequate care for them. In this connection, however, the Fourth Department declared that where

> "parental rights are terminated after a finding that the parent is unable by reason of mental illness or mental retardation to provide proper and adequate care for his or her child or after a finding of permanent neglect (*see* Social Services Law § 384-b [4] [c], [d]), Family Court may, in those cases in which the court deems it appropriate, exercise its discretion in

determining whether some form of posttermination contact with the biological parent is in the best interests of the child" (*id.* at 1165).

In so holding, the court expressly disavowed its contrary decisions in *Matter of Kenneth D.* (32 AD3d 1237 [4th Dept 2006]) and *Matter of Livingston County Dept. of Social Servs. v Tracy T.* (16 AD3d 1133 [4th Dept 2005]).[5]

Thus, the Fourth Department in *Matter of Kahlil S.* remitted the matter to Family Court for a hearing as to whether posttermination contact with their mother was in the children's best interests (35 AD3d at 1165-1166). The court observed that in making this determination, Family Court was to "consider, inter alia, the ages of the children, the bond between [the mother] and the children, and the likelihood that the children will be adopted" (*id.* at 1166).[6] Section 634 of the Family Court Act is the only statute cited by the Fourth Department to support its decision. This provision states merely that an order entered after a dispositional hearing committing a child's guardianship and custody to an authorized agency may be made "on such conditions, if any, as [the court] deems proper."

Subsequent to *Matter of Kahlil S.*, the Fourth Department has handed down decisions reiterating or presuming that Family Court possesses authority to provide for posttermination contact, and must, upon a parent's request, decide whether such a continuing relationship is in the child's best interests (*see e.g. Matter of Thomas B.*, 35 AD3d 1289 [4th Dept 2006], *lv dismissed* 8 NY3d 936 [2007] [remitting for best interests determination where parental rights were terminated by reason of mental illness]; *Matter of Bert M.*, 50 AD3d 1509 [4th Dept 2008], *lv denied* 11 NY3d 704 [2008] [same, where parental rights were terminated after a finding of permanent neglect]; *Matter of Josh M.*, 61 AD3d 1366 [4th Dept 2009] [same, where

---

**5.** In both cases, parental rights were terminated on the ground of permanent neglect and the Fourth Department opined that Family Court lacked authority to provide for visitation. The court specifically noted in *Matter of Livingston County Dept. of Social Servs.* that "[v]isitation is authorized only where parental rights are surrendered voluntarily" (16 AD3d at 1133).

**6.** At the hearing held upon remittal, Family Court granted the mother "reasonable" posttermination visitation with Terrell Z., but concluded that posttermination contact with Kahlil S. would interfere with his pending adoption and was therefore not in his best interests. The Appellate Division affirmed (*see Matter of Kahlil S.*, 60 AD3d 1450 [4th Dept 2009], *lv dismissed* 12 NY3d 898 [2009]).

parental rights were terminated on the basis of mental retardation]; *Matter of Diana M.T.*, 57 AD3d 1492 [4th Dept 2008], *lv denied* 12 NY3d 708 [2009] [affirming Family Court's denial of request for posttermination visitation made by father whose parental rights were terminated on the ground of mental illness]; *Matter of Samantha K.*, 59 AD3d 1012 [4th Dept 2009] [Family Court's order terminating father's parental rights upon a finding of permanent neglect, while allowing him to retain visitation rights, was in the child's best interests]; *Matter of Seth M.*, 66 AD3d 1448 [4th Dept 2009], *lv dismissed* 13 NY3d 922 [2010] [concluding that Family Court erred by deciding in permanent neglect proceeding that it lacked authority to permit posttermination visitation, and remitting for best interests determination]; *Matter of Lashawnda G. [Shawn G.]*, 91 AD3d 1348 [2012], *lv denied* 19 NY3d 802 [2012] [record established that Family Court reviewed the relevant factors before determining that posttermination visitation was not in child's bests interests]).

The picture in the Second Department is cloudier. That court has endorsed the availability of posttermination contact where parental rights were terminated on the ground of mental retardation (*see Matter of Corinthian Marie S.*, 297 AD2d 382 [2d Dept 2002])[7] or mental illness (*see Matter of Selena C. [Thelma C.]*, 77 AD3d 659 [2d Dept 2010] ["courts have the *inherent authority*" to provide for posttermination contact where this is "in the best interests of the child and does not unduly interfere with the adoptive relationship" (emphasis added)]), but not where based on abandonment (*see Matter of Lovell Raeshawn McC.*, 308 AD2d 589 [2d Dept 2003]).

In *Matter of Lovell Raeshawn McC.* the court cited *Matter of Cheyanne M.* (299 AD2d 162 [1st Dept 2002]). There, the First Department took the position that "[w]hile postadoption contact is permitted in the context of a surrender agreement pursuant to Social Services Law § 383-c, it remains that 'open adoption' is not a dispositional option in the context of a termination proceeding pursuant to Social Services Law § 384-b" (*id.* at 162, citing *Matter of Gregory B.*, *supra*, and *Matter of Jacob*, 86 NY2d 651 [1995]). But the Second Department recently relied on *Matter of Kahlil S.* and its Fourth Department progeny in a case

---

**7.** Notably, in *Matter of Corinthian Marie S.*, the children's law guardian and prospective adoptive parents *consented* to the posttermination contact over the objection of the Dutchess County Department of Social Services.

where a mother's parental rights with respect to two children, one of whom was severely disabled and institutionalized, were terminated on the ground of permanent neglect (*Matter of Kyshawn F.*, 95 AD3d 883 [2d Dept 2012]). The court modified the order of disposition with respect to the disabled child so as to provide for posttermination visitation, and remitted the matter for Family Court to determine what frequency of visits was in the child's best interests.

*Matter of April S.* (307 AD2d 204 [1st Dept 2003], *lv denied* 1 NY3d 504 [2003]) is the principal case in the First Department to discuss posttermination contact. There, Family Court entered dispositional orders directing postadoption visitation between the mother and her two children after terminating the mother's parental rights upon a finding of permanent neglect. The First Department vacated this provision of the orders, citing its decision in *Matter of Cheyanne M.* and our decision in *Matter of Gregory B.* In discussing *Matter of Gregory B.*, the court emphasized our view "that it [was] up to the Legislature to determine and direct which circumstances, if any, are amenable to the 'open adoption' process"; and added that

> "the Legislature did so in 1990, when it enacted Social Services Law § 383-c, for the first time providing for procedures by which a parent may surrender a child conditioned upon the retention of certain rights of contact or visitation. From the fact that no alteration was made to section 384-b, it must be presumed that there was no legislative intent to extend the concept of open adoption to adoptions following parental terminations pursuant to section 384-b" (307 AD2d at 204).

The First Department distinguished the Second Department's decision in *Matter of Corinthian Marie S.* on the basis of "exceptional circumstances" (*id.* at 205; *see* n 7, *supra*).

The Third Department appears to have grappled with the issue on this appeal as early as 1994 in *Matter of Rita VV.* (209 AD2d 866 [3d Dept 1994], *lv denied* 85 NY2d 811 [1995]). There, Family Court's dispositional order in the permanent neglect proceeding conditioned adoption upon visitation with the child's biological mother and maternal grandparents. The court held this to be error, commenting that

> "Social Services Law § 384-b contemplates an adversarial proceeding. It does not contain a provision

that upon a determination that parental rights should be terminated a court can require or permit contact by and between a biological parent and a child who has been adopted. While Family Court was correct that the Legislature has amended Social Services Law § 383-c to allow a parent to condition a *voluntary surrender* for adoption upon . . . contact with the child or information concerning the child, the proceeding herein did not involve such a voluntary surrender. Accordingly, the provisions of Social Services Law § 383-c are wholly inapplicable and, therefore, Family Court was without authority in this *adversarial proceeding* to require such continued contact as a condition of adoption" (*id.* at 868-869).[8]

In a string of subsequent cases, the Third Department has steadfastly adhered to the position that Family Court may not direct posttermination contact in a case where parental rights have been ended pursuant to Social Services Law § 384-b (*see e.g. Matter of Shane J. v Cortland County Dept. of Social Servs.*, 305 AD2d 751 [3d Dept 2003] ["It is well settled that the termination of . . . parental rights necessarily include(s) the denial of 'the rights ever to visit, communicate with, or regain custody of the child' " (quoting *Santosky v Kramer*, 455 US 745, 749 [1982])]; *Matter of Jessi W.*, 20 AD3d 620 [3d Dept 2005] [Family Court lacked authority to permit the visitation requested by the father once his parental rights were terminated]; *Matter of William W.*, 23 AD3d 735 [3d Dept 2005] [rejecting claim of the mother, whose parental rights were terminated on the ground of mental retardation, that Family Court should have held a dispositional hearing to examine options for her to maintain continued contact with her children]; *Mattter of Labron P.*, 23 AD3d 943, 945 [3d Dept 2005] ["Family

---

**8.** Father complains that "[u]nder the rule of the Third Department, only a parent who exercises his due process right to a hearing . . . risks losing the right to post-termination contact" while "[a] parent who surrenders his parental rights without a hearing . . . may do so on condition that he retain some right to post-termination visitation." He thus likens sections 383-c and 384-b in this regard to the provisions struck down on due process grounds in *Matter of Hynes v Tomei* (92 NY2d 613 [1998]). But *Hynes* involved an increased punishment for failure to plead guilty in a criminal case. Here, the Legislature is not increasing punishment based on the exercise of a constitutional right, but rather is making a policy judgment that a particular kind of conditional relief—i.e., posttermination contact—is likely to be beneficial to children in consensual but not contested proceedings.

Court correctly surmised that it lacked the authority to include . . . a provision (granting postadoption visitation) in the dispositional order" entered in the permanent neglect proceeding]; *Matter of John KK.*, 34 AD3d 1050, 1052 [3d Dept 2006] ["Although a court may order postadoption visitation when the termination results from a voluntary surrender under Social Services Law § 383-c, an adversarial proceeding pursuant to Social Services Law § 384-b does not afford such option"]; *Matter of James X.*, 37 AD3d 1003, 1007 [3d Dept 2007] ["(I)t is axiomatic that when parental rights are terminated pursuant to an adversarial proceeding that results in a finding of permanent neglect, the court lacks authority to permit visitation to a respondent"]; *Matter of Melissa DD.*, 45 AD3d 1219, 1221-1222 [3d Dept 2007], *lv denied* 10 NY3d 701 [2008] ["Because (the mother's) parental rights were terminated in an adversarial proceeding, not as a result of a voluntary surrender, Family Court had no authority to permit posttermination visitation between her and the children"]; *Matter of Raine QQ.*, 51 AD3d 1106 [3d Dept 2008], *lv denied* 10 NY3d 717 [2008] [same]).

In *Matter of Xionia VV. (Amos VV.)* (78 AD3d 1452, 1453 [3d Dept 2010]), the Third Department rejected the father's "sole contention on appeal, relying upon authority from the Appellate Division, Fourth Department"—in particular, *Matter of Kahlil S.*—"that Family Court should have awarded him posttermination visitation with the child." The court reiterated its view that Family Court does not possess authority to grant such a request in an adversarial proceeding pursuant to Social Services Law § 384-b.

## IV.

Relying on section 634 of the Family Court Act, father argues that if the disposition of a petition brought pursuant to Social Services Law § 384-b

> "is to be termination of parental rights, then, the Family Court Act directs[ ] that termination is to be 'on such conditions, if any, as [the court] deems proper,' and what conditions, if any, to impose is to be decided solely on the basis of the child's best interests. Therefore, under the Family Court Act, if the child's best interests would be served by termination of parental rights on condition that the biological parent retain some right of contact with the child, then Family Court must so order."

■ The flaw here is that father presupposes that this particular kind of condition—one preserving contact between parent and child notwithstanding the termination of parental rights—is a condition the court is empowered to mandate. There is concededly no statutory support for such authority outside the context of a voluntary surrender pursuant to Social Services Law § 383-c, as the First Department recognized in *Matter of April S.* and the Third Department has repeatedly emphasized. Father seeks to overcome this obstacle by arguing, in effect, that Family Court possesses an inherent discretionary authority to provide for posttermination contact in a dispositional order when determined to be in the child's best interests. But this argument runs counter to our decision in *Matter of Gregory B.*

In that case, we also decided an appeal taken from the judgment of Family Court in *Matter of Delores B.*, which terminated the father's parental rights on the ground of permanent neglect. That appeal brought up for review the Appellate Division's prior order reversing the Family Court's order dismissing the petition, and remanding the matter for a dispositional hearing (141 AD2d 100 [1st Dept 1988]). As we explained in *Matter of Gregory B.*, in *Matter of Delores B.* two of the Justices in the Appellate Division—one of whom concurred in part and dissented in part; the other of whom dissented—voiced sympathy for the notion of coupling termination of parental rights with some provision for continuation of contacts between the father and his children, Delores B. and her brother, Willie John B., also adjudicated to be permanently neglected (74 NY2d at 85-86).

While acknowledging the reasons "prompting some to advocate 'open' adoptions in which the court supplements an order of adoption with a provision directing that the adopted child have continuing contacts and visitation with members of his or her biological family," we "express[ed] no opinion as to whether such contacts generally would be helpful and appropriate once parental rights have been terminated and the child has been adopted into a new family or whether a court should have the discretionary authority to order such contacts" (*id.* at 90-91). Further, we observed, "the 'open' adoption concept would appear to be inconsistent with this State's view as expressed by the Legislature that adoption relieves the biological parent 'of all parental duties toward and of all responsibilities for' the adoptive child over whom the parent 'shall have no rights' " (*id.* at 91, quoting Domestic Relations Law § 117 [1] [a], and citing

*Matter of Best*, 66 NY2d 151 [1985]). We then closed our discussion of this issue as follows:

> "Although adoptive parents are free, at their election, to permit contacts between the adopted child and the child's biological parent, to judicially require such contacts arguably may be seen as threatening the integrity of the adoptive family unit. In any event, 'open' adoptions are not presently authorized. If they are to be established, it is the Legislature that more appropriately should be called upon to balance the critical social policy choices and the delicate issues of family relations involved in such a determination" (74 NY2d at 91).

Father counters that in *Matter of Jacob* we recognized that the Legislature, by authorizing open adoptions in Social Services Law § 383-c without amending Domestic Relations Law § 117, "implicitly rejected Matter of Gregory B.'s reading of [the latter statute] to invariably preclude any continued right of contact following termination of parental rights." But again, father's argument begs the question. As we stated in *Matter of Jacob*, "[o]ne conclusion that can be drawn" from the Legislature's enactment of section 383-c "is that section 117 does not invariably require termination in the situation where the biological parent, having consented to the adoption, has agreed to retain parental rights and to raise the child together with the second parent" (86 NY2d at 667). In other words, section 117 did not "require termination" in *Matter of Jacob* because the Legislature acted to provide otherwise in the case of a voluntary surrender. And the Legislature, the entity best suited "to balance the critical social policy choices and the delicate issues of family relations involved" in such matters (*Matter of Gregory B.*, 74 NY2d at 91), has not sanctioned judicial imposition of posttermination contact where parental rights are terminated after a contested proceeding. Absent legislative warrant, Family Court is not authorized to include any such condition in a dispositional order made pursuant to Social Services Law § 384-b.[9]

---

**9.** The dissenting judge "would prefer to sanction, rather than restrict, the hearing court's exercise of discretion, particularly in the area of family law where flexibility in judicial decision-making is a virtue of the highest order" (dissenting op at 445). Putting aside that the Legislature has not chosen to vest Family Court with this particular discretion and flexibility, the County Attorneys from Monroe, Saratoga and Washington Counties, in their respective

*(n. cont'd)*

Finally, we have examined father's remaining claims and consider them to be without merit. Accordingly, the order of the Appellate Division should be affirmed, without costs.

PIGOTT, J. (dissenting). There is no support in the record for the finding that the Department of Social Services made "diligent efforts to encourage and strengthen the parental relationship" in this case, as required by Social Services Law § 384-b (7) (a). Moreover, I agree with Appellate Division precedent holding that the hearing court has the discretionary authority to order posttermination visitation with a parent whose rights have been terminated under Social Services Law § 384-b. Accordingly, I dissent.

## I.

Shortly after he was imprisoned, the father of Hailey ZZ. became concerned that her mother was not taking appropriate care of the infant girl. He asked one of his sisters—whom I shall refer to as "K"—to file for custody of Hailey and her half-sister. As he later recalled,

> "I asked her to begin with, to file for custody of the kids, because the kids were being left with God only knows who for how long, so that's what started this whole situation, because I had asked her to file a petition for custody of my daughter, so I knew that she was safe."

K filed for custody. When the attention of the Department of Social Services (DSS) was drawn to Hailey's situation, DSS removed her from her mother's custody pursuant to Family Court Act § 1024, and sent her to live with nonrelative foster parents, initially with a woman whom I shall call "N."

---

amicus briefs, point out the practical problems with leaving the decision on posttermination contact up to a judge. Specifically, the uncertainty and the potential for delay and added expense inhering in this approach discourage, and may derail, the adoption of neglected children, thus reducing their opportunities to be placed in a permanent home, or, if they are adopted, threatening the integrity of the new family unit. As the Monroe County Attorney explains, many prospective adoptive parents are reluctant or unwilling to entertain the prospect of facilitating contact between a child and a biological parent sufficiently troubled to have lost parental rights. On the flip side of the coin, adoptive parents who do not object to posttermination contact are going to permit this to happen without the necessity of a court order. Surely, adoptive parents are the best arbiters of whether continued contact with the birth parent is in a child's best interests.

Because Hailey's father knew N, and knew she would take good care of Hailey and allow him to see his daughter, Hailey's father asked K to drop her custody application. N and K worked together to continue the father-daughter bond while Hailey's father was in prison. With the cooperation of N, K drove Hailey to visit her father every month, for about three or four hours at a time. The two would hug each other; Hailey's father, whom she called "Daddy," read her books; and they played with puzzles. DSS observed no ill effects whatsoever from these visits.

While in prison, Hailey's father took parenting classes and completed his General Educational Development credential. Unfortunately, while DSS told Hailey's father that he would need to "plan for" Hailey's future, he was given little hint and no specific information about how he might fulfil this requirement while incarcerated.

DSS asked Hailey's father to provide a list of people with whom Hailey might live until he was released. He proposed his father, his sister K, and another sister—whom I shall call "P." DSS's family assessment and service plan reports that, in addition to K, who had filed for custody, P called DSS and said she would be willing to care for Hailey and her half-sister.

Correspondence between DSS and Hailey's father in early 2010 gives no hint of the urgency of his finding a suitable relative (or a friend who was a certified foster parent) who could file for custody or guardianship of Hailey and take care of her until he was able to (*see generally* Family Ct Act § 1017), in that way demonstrating his planning for the future of the child.

A letter from Hailey's DSS caseworker to her father, dated January 26, 2010, which contains no specifics whatsoever, is accompanied by a "current service plan" that, in listing problems and concerns, merely notes that Hailey's father "needs to assist in the permanency plans for his daughter Hailey." This was something Hailey's father thought he was doing by providing relatives' names and contact information and participating in programs provided by the Department of Correctional Services.

Then, a letter from a different DSS caseworker, dated March 16, 2010, warned Hailey's father that a hearing was imminent at which DSS would seek to free Hailey for adoption (by a non-relative), but gave him no information about how he could take concrete steps towards the return of his child. While the caseworker asked Hailey's father to suggest someone "as a long term home for Hailey" and added that the person would have to

clear certain background checks, she failed to explain whether, or why, the people Hailey's father had already proposed were considered unsuitable, and she neglected to specify any relationship or credentials required of the person able to provide the "long term home."[1]

Ten days later, on March 26, 2010, DSS filed petitions against Hailey's mother and father, seeking orders adjudicating Hailey to be a permanently neglected child, terminating parental rights under Social Services Law § 384-b, and committing her to the care and custody of DSS. Thereafter, on or around April 5, 2010, Hailey's caseworker had a conversation with Hailey's father in which the caseworker told him that DSS had ruled out his father and one of his sisters as possible caregivers.

Hailey's mother voluntarily surrendered her parental rights. Hailey's father was told that if he did the same, DSS would permit him to see Hailey—but only once a year. He refused.

In the summer of 2010, Hailey and her half-sister were transferred from N's foster home to that of other nonrelative foster parents. Whereas N had facilitated communication between Hailey and her father, who regularly sent cards to her, neither the new foster parents nor DSS provided Hailey's father with her new address.

At the fact-finding hearing held in Supreme Court on July 23, 2010, Hailey's three successive caseworkers testified, as did her father. One caseworker was asked whether K had been considered a "resource" who could look after Hailey. She could not remember, but said she believed that K had been "explored." The caseworker could not recall whether P had been "explore[d]." The third caseworker testified that DSS had ruled out Hailey's paternal grandfather and at least one of the sisters proposed by Hailey's father, but could not recall what it was in her background that had ruled her out, or even which sister it was.

For his part, Hailey's father testified that his sister P, who was employed and had an infant daughter of her own whom she cared for, could look after Hailey. He insisted that he had received no response to this suggestion from DSS. Asked whether P had been the subject "of a hotline alleging abuse or neglect on her part," Hailey's father responded in the negative.

---

1. If there were other communications before the March 16 letter in which all this was straightforwardly explained, I do not find clear and convincing proof of them in the record.

Asked whether P had lost a job working with the elderly "because she was hotlined for elder abuse," Hailey's father initially answered with the word "Yes." But he then immediately clarified that P had been "hotlined"—had been the subject of a complaint made in a call to a telephone service—and had lost her job thereafter, but she had never been told what perceived wrong she had been "hotlined" for.

Hailey's father also mentioned someone else who might file for custody or guardianship of his daughter—his girlfriend, who worked as a teacher's aide at an elementary school and had custody of her younger siblings. He conceded that his father would not be a suitable caregiver.

Asked to describe his relationship with his daughter, Hailey's father began by saying "I'd do anything for her," and described the mutual happiness their relationship gave them. On cross-examination, he conceded, "I would sign over my rights if you guys were going to be a little more lenient on this whole visitation. . . . I don't want to be taken out of her life, but I'm not going along with two hours once a year."

As the majority notes, Supreme Court granted DSS's application to adjudicate Hailey a permanently neglected child, finding that DSS had made the requisite "diligent efforts" to encourage and strengthen the parental relationship, and that Hailey's father had failed to plan for her future for more than a year after she came into DSS's custody. In discussing the possible caretakers Hailey's father had proposed, Supreme Court, without reference to his testimony on the subject, simply stated that P had been "fired from her employment, working with the elderly, due to elder abuse."

At the subsequent dispositional hearing, DSS argued in favor of Hailey's adoption by the foster parents with whom she was living, and Hailey's father asked for visitation if she were adopted. Supreme Court terminated Hailey's father's parental rights, and determined that posttermination visitation would not be in Hailey's best interests.

## II.

The majority concedes, as it must, that "[a]n authorized agency that brings a proceeding to terminate parental rights based upon permanent neglect bears the burden of establishing that it has made 'diligent efforts to encourage and strengthen the parental relationship' " (majority op at 429, quoting Social

Services Law § 384-b [7] [a]). In the first instance, I differ from the majority in that I believe there is no record support for the finding that DSS met this burden.

DSS had to show—by "clear and convincing proof" (Social Services Law § 384-b [3] [g] [i]; *see* [4] [d]; [7] [a])—that it provided adequate assistance to Hailey's father with a view to "resolv[ing] or ameliorat[ing] the problems preventing discharge of the child to [his] care" (*Matter of Star Leslie W.*, 63 NY2d 136, 142 [1984]; *see* Social Services Law § 384-b [7] [f]). The requirements are stringent, and, unless it would be detrimental to the child's best interests, the agency's efforts must be directed towards the goal of *returning the child to his or her parent*. We have insisted that the petitioning agency is required to "determine the particular problems facing a parent with respect to the return of his or her child and make affirmative, repeated, and meaningful efforts to assist the parent in overcoming these handicaps" (*Matter of Sheila G.*, 61 NY2d 368, 385 [1984]). And the statute itself requires—and required on July 23, 2010, when the fact-finding hearing in this case was held—that the hearing court "shall consider the special circumstances of an incarcerated parent or parents . . . when determining whether a child is a 'permanently neglected child' " (Social Services Law § 384-b [7] [a]).

There is no record support for the finding that DSS exercised diligent efforts to encourage and strengthen the parental relationship with Hailey, with a view to returning Hailey to her father. Here, "the particular problems facing [Hailey's father] with respect to the return of his . . . child" (*Sheila G.*, 61 NY2d at 385) were that he was incarcerated, that he was required to identify a suitable custodian for Hailey who could look after her until he was able to care for her himself (*see generally* Family Ct Act § 1017), and that his own biological parents would not be considered suitable caregivers. DSS was obliged to "make affirmative, repeated, and meaningful efforts" to help Hailey's father overcome these handicaps (*Sheila G.*, 61 NY2d at 385). Such efforts should clearly have included straightforward and unambiguous communications to Hailey's father of the need for him to identify a suitable custodian and, after he mentioned his sisters, meaningful efforts to determine whether one of the sisters would have been able to look after Hailey.

Instead, DSS failed to communicate the urgent need of finding a suitable caregiver until it was effectively too late. Notably, the January 26, 2010 letter from Hailey's DSS caseworker

makes no mention of the need for Hailey's father to propose possible custodians of Hailey other than those he had already mentioned. Additionally, DSS did not notify Hailey's father in the March 16, 2010 letter or any other letter that any nonrelative he named would have to be a certified foster parent, so that he was unaware that his girlfriend would not be immediately acceptable, despite her qualifications as a teacher's aide.

Nor is there any evidence in the record of the required "repeated . . . efforts" (*Sheila G.*, 61 NY2d at 385) to get to the bottom of whether one of Hailey's father's sisters would be able to care for Hailey until her father was able to do so himself. The record is devoid of support for a finding that DSS even attempted to contact P. It appears that DSS jumped to the conclusion that she was unsuitable because of her allegedly being "hotlined," but the record contains no evidence of the nature of this "hotlining," or of whether the allegations against P were ever substantiated. There is no suggestion that P was charged. All the record contains is a bare accusation. It is regrettable that the majority repeats the accusation as if the record supported its truth (*see* majority op at 427).

To meet its obligation of proving by clear and convincing evidence that it made the necessary diligent efforts, DSS must establish more than that it rejected an alternative resource suggested by him; it must prove a sound basis for that rejection. At the time of the fact-finding hearing, P had a child of her own, and certainly there was no evidence that DSS sought to take that child away from her. In short, the record shows a bureaucratic shortcut to judgment on the part of DSS and the lower courts, and that the parental rights of Hailey's father should not have been terminated.[2]

---

**2.** In my view, to the extent that Hailey's father may have failed to plan for her future in a realistic, feasible way, that failure is excused by the failure of DSS to exercise the requisite diligent efforts. Moreover, whether Hailey's father failed to plan for her future may be debated. Contrary to the majority (*see* majority op at 431), it is not true that his only plan was to allow Hailey to remain in foster care until he was released from prison. He had a reasonable backup plan; he consistently argued that his sister P was a suitable alternative. I accept that "an incarcerated parent may not satisfy the planning requirement of the statute where the only plan offered is long-term foster care lasting potentially for the child's entire minority" (*Matter of Gregory B.*, 74 NY2d 77, 90 [1989]). Here, however, there is no support for the view that Hailey's father's only workable plan was to keep Hailey "in foster care while maintaining contact . . . during the period of incarceration" (*id.* at 87-88).

### III.

As to the question whether the hearing court has the authority to order contact between a parent and his or her child after parental rights have been terminated under Social Services Law § 384-b, I believe the hearing court has the authority to do so—not because the parent still retains rights over the child (*see* Domestic Relations Law § 117 [1] [a]), but in the exercise of proper discretion by the court. In *Matter of Gregory B.* (74 NY2d 77 [1989]), we left open the question of such "discretionary authority" (*id.* at 91 ["We express no opinion as to whether such contacts generally would be helpful and appropriate once parental rights have been terminated and the child has been adopted into a new family or whether a court should have the discretionary authority to order such contacts"]).

The first thing to be said about this issue is that reasonable opinions on it differ. The Appellate Divisions are split on the matter, with the First and Third Departments taking the position that courts have no authority to order posttermination contact, and the Second[3] and Fourth Departments taking the view that they do. Even the amici in the present case are split; we received a defense of the status quo in the Fourth Department from the Legal Aid Bureau of Buffalo and a critique from the Monroe County Attorney. With this in mind, I would prefer to sanction, rather than restrict, the hearing court's exercise of discretion, particularly in the area of family law where flexibility in judicial decision-making is a virtue of the highest order. The most fundamental determination in this area is the inherently discretionary one of what is in a child's best interests.

In my view, the Fourth Department had it right. A hearing court "may, in those cases in which the court deems it appropriate, exercise its discretion in determining whether some form of posttermination contact with the biological parent is in the best interests of the child" (*Matter of Kahlil S.*, 35 AD3d 1164, 1165 [4th Dept 2006] [remitting to Family Court for a hearing to determine whether posttermination contact was in the best interests of the children, and noting the psychological harm that may result from "an abrupt and complete cessation of contact" between a child and her biological parent, especially when the child "has strong emotional attachments to the birth family"]).

---

**3.** In the Second Department, an exception applies when the termination is on the basis of abandonment.

The statutory basis is Family Court Act § 634, which provides that, with respect to a disposition on an adjudication of permanent neglect, the hearing court may enter the order "on such conditions, if any, as it deems proper." The majority makes much of the fact that the Legislature has not explicitly "sanctioned judicial imposition of posttermination contact where parental rights are terminated after a contested proceeding" (majority op at 438). However, it is worth noting that the Legislature has also not seen fit to *eliminate* the judicial imposition of posttermination contact in the six years since *Kahlil* was decided.

*Kahlil* hearings, as they are called, are now commonplace in the Fourth Department. As the Legal Aid Bureau of Buffalo suggests, the process can be particularly valuable when the biological parent's rights have been terminated on the ground of a mental disability of one kind or another on the part of the parent, rather than permanent neglect. In these situations the child's attachment to a natural parent who is incapable of looking after the child through no fault of his or her own may be profound, and worthy of preservation. Conversely, it may be in the best interests of a disabled, institutionalized child for there to be court-sanctioned posttermination visitation, when there is a mutual emotional attachment (*see e.g. Matter of Kyshawn F.*, 95 AD3d 883 [2d Dept 2012]). In fact, DSS does not dispute that the best interests of some children may be served by posttermination visitation.

As a matter of policy and, more fundamentally, logic, it makes little sense to prohibit a court from ordering visitation *when that would be in a child's best interests*, simply because the person seeking visitation contested the issue of his or her parental rights. Indeed, in the present case this perceived restriction meant that a visitation agreement could be and was executed with Hailey's birth mother, who apparently has never shown very much interest in her, whereas Hailey's biological father, who has at every turn tried to be a responsible parent and to strengthen his ties with his daughter, is denied visitation. In my view, this is patently unfair. And in a future case— one in which the hearing court is ready to find visitation to be in the child's best interests—the prohibition would undoubtedly be harmful to some degree or other to the child's psychological well-being.

Lastly, as this case itself illustrates, the alternative of surrendering one's parental rights in exchange for visitation, which

the majority emphasizes, is often no real alternative at all. Hailey's father, despite successful, monthly visitation and even more frequent contact by mail, was offered *annual* visitation— less than he was enjoying at the time and clearly not an opportunity to continue the meaningful relationship he had with his daughter.

## IV.

Neither DSS nor Hailey's own attorney—who submitted a brief but did not appear at oral argument—argues with much conviction that visitation would not be in Hailey's best interests. In fact, her attorney adds nothing specific with respect to Hailey in the part of his brief that discusses the visitation issue. I am not convinced that Supreme Court was correct in its view that "there was no evidence presented to show there is a strong emotional bond between the respondent and the child or that any harm would come from discontinuing said visitation." The visitation issue was decided by the Appellate Division on the ground that the hearing court lacked authority to grant posttermination visitation. Were I to agree that the permanent neglect petition was properly granted, I would nevertheless remit this matter to the Appellate Division to review whether visitation would be in Hailey's best interests.

## V.

For the reasons stated in part II of this opinion, I would reverse the order of the Appellate Division, and dismiss the permanent neglect petition, without prejudice to future proceedings.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, SMITH and JONES concur with Judge READ; Judge PIGOTT dissents and votes to reverse in a separate opinion.

Order affirmed, without costs.