Matter of Jennifer JJ. v Jessica JJ. (2022 NY Slip Op 02043)





Matter of Jennifer JJ. v Jessica JJ.


2022 NY Slip Op 02043


Decided on March 24, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:March 24, 2022

531445
[*1]In the Matter of Jennifer JJ., Petitioner,
v
Jessica JJ., Appellant. (And Two Other Related Proceedings.)

Calendar Date:January 14, 2022

Before:Garry, P.J., Clark, Aarons, Reynolds Fitzgerald and Fisher, JJ.

Rural Law Center of New York, Castleton (Kristin A. Bluvas of counsel), for appellant.
Christine E. Nicolella, Delanson, attorney for the children.



Reynolds Fitzgerald, J.
Appeal from an order of the Family Court of Otsego County (Lambert, J.), entered February 28, 2020, which, among other things, granted petitioner's applications, in two proceedings pursuant to Family Ct Act article 6, for modification of a prior order of visitation.
In 2017, respondent (hereinafter the biological mother) surrendered her parental rights to her son (born in 2014) and her daughter (born in 2016), who were then adopted by petitioner (hereinafter the adoptive mother) and her husband. The biological mother and the adoptive mother entered into a postadoption contact agreement for each child allowing the biological mother to have two supervised visits per year and to receive photographs of the children twice per year. The agreements were incorporated into the order of adoption. In June 2019, the adoptive mother filed two petitions to modify the postadoption contact agreements. In August 2019, the biological mother filed a cross petition alleging, among other things, that the adoptive mother refused to bring the son to a July 2019 visit with the biological mother. Following a hearing, Family Court terminated visitation between the biological mother and the children. The biological mother appeals.
The biological mother contends that Family Court's determination that it was in the children's best interests to terminate her postadoption visitation lacks a sound and substantial basis as the adoptive mother's testimony was self-interested and unfairly correlated the son's behavior with the biological mother, and Family Court improperly delegated its responsibility to discern the children's best interests to the son's counselor by relying solely upon the counselor's testimony when making its determination. "Pursuant to Domestic Relations Law § 112-b (4), birth parents and adoptive parents may enter into a legally enforceable agreement regarding postadoption contact that may thereafter be enforced by filing a petition in Family Court. Enforcement of a postadoption contact agreement, however, will only be ordered if it is determined to be in the child's best interests" (Matter of Lynn X. [Joseph W.], 145 AD3d 1291, 1292 [2016] [internal quotation marks and citations omitted]). "[T]he hearing court's determination of best interests will only be disturbed if it lacks a sound and substantial basis in the record" (Matter of Heidi E. [Tresea F.—Phyllis G.], 68 AD3d 1174, 1174 [2009]).
The evidence presented by the adoptive mother at the fact-finding hearing consisted of her testimony and the testimony of the son's counselor. The counselor testified that she is a licensed clinical social worker who has been treating the son biweekly since 2018. According to her, the son has autistic spectrum disorder, attention deficit hyperactivity disorder and anxiety disorder. The counselor testified that the son requires a very rigid routine and struggles with any changes in his routine. Although the counselor had not personally observed the son's [*2]behavior directly following the son's contact with the biological mother, said behavior had been described to her by those who had witnessed it, namely the son's adoptive mother and his school teachers. Moreover, she was familiar with the significant behavioral outbursts that he displayed when encountering other changes in his routine. Additionally, the counselor testified that any change in the son's routine is "really . . . disruptive" for the son.
The adoptive mother testified that after visiting the biological mother in December 2017, the son destroyed rooms in the house and was completely out of control for close to a month. After the July 2018 visit with the biological mother, the son "climb[ed] the walls in [his] classroom," hit his friend, hurt his sister and had difficulties regulating his behavior for several months. The December 2018 visit with the biological mother did not occur because she was incarcerated for assaulting her husband with a knife. The son did not attend the July 2019 visit with his biological mother. Although the daughter's reactions to the visits were less extreme, the record evinces that, after the December 2017 visit, she began banging her head and had nightmares. This behavior was repeated after the July 2018 visit and, following the July 2019 visit, she had nightmares. In contrast, the biological mother testified that the visits went well, that the adoptive mother never advised her of any concerns related to the children's well-being and that the children had emotional problems prior to the adoption.
Family Court credited the testimony of the adoptive mother and the son's counselor. "The court was entitled to credit [the adoptive mother's] testimony regarding the special needs of the [son] and her opinion that continued visits with [the biological mother] would not be in the best interests of the child[ren] based upon the child[ren]'s needs" (Matter of Sapphire W. [Mary W.—Debbie R.], 120 AD3d 1584, 1585 [2014]). Contrary to the biological mother's assertion, Family Court did not improperly delegate its authority to determine the best interests of the children to the son's counselor, as demonstrated by the court sustaining an objection to the counselor's testimony as it related to the "ultimate question" in the proceeding. Family Court was entitled to consider the opinion of the son's counselor and did not rely solely upon it in making its determination (see Matter of Donald G. v Hope H., 160 AD3d 1061, 1064 [2018]; Matter of Kaylee O., 111 AD3d 1273, 1274 [2013]). Moreover, Family Court's credibility determinations are entitled to great deference (see Matter of Yasmine T. [Aeisha G.—Keisha G.], 161 AD3d 1179, 1180 [2018], lv denied 32 NY3d 903 [2018]; Matter of Stephanie RR. [Pedro RR.], 140 AD3d 1237, 1238 [2016]). Accordingly, Family Court's determination that it is in the children's best interests to terminate postadoption contact with the biological mother is supported by a sound and substantial [*3]basis in the record (see Matter of Sapphire W. [Mary W.—Debbie R.], 120 AD3d at 1585). The biological mother's remaining contentions have been rendered academic.
With respect to the dissent's reference to the policy concerns underlying postadoption contact agreements, we note that we wholeheartedly embrace and promote the policies and goals of these types of agreements and encourage open adoptions. However, it is not our intention to address the underlying policies of postadoption contact agreements, but, instead, to focus solely upon the principle governing and guiding the initiation and continuation of open contact between the children and the biological parent — the best interests of the children. Here, it is uncontroverted that the daughter displayed a persistent pattern of bizarre and harmful behavior — head banging and disrupted sleep due to nightmares — commensurate with visits with her biological mother. These behaviors continued for 1½ years. Although the daughter did not display the behaviors at the time of the visits, a time when the adoptive parents were present and the daughter's attention was directed toward other activities, the behaviors were manifested subsequent to each visit. Furthermore, we cannot agree that enforcing visitation with respect to one sibling but not the other serves the best interests of either. According due deference to Family Court's credibility determinations, we affirm.
Clark and Fisher, JJ., concur.
Garry, P.J. (concurring in part and dissenting in part).
Respondent (hereinafter the biological mother) executed voluntary judicial surrenders of the two subject children, with the condition that she be entitled to two short supervised visits and two updates per year; two years later, petitioner (hereinafter the adoptive mother) commenced proceedings to terminate the visits. We agree with the majority that there is adequate record support for Family Court's determination that visitation was not in the best interests of the son. The determination relative to the daughter is not similarly supported; there is a dearth of evidence as to the daughter and her best interests, and the court's decision provides scant analysis supporting the finding. We therefore dissent as to this younger sibling.
It bears emphasizing that the adoptive mother had agreed to accept limited postadoption contact, and Family Court had approved the voluntary surrenders of the children — which necessarily included a finding that such contact would be in the children's best interests (see Domestic Relations Law § 112-b [2]) — a mere two years prior to the filing of the underlying petitions. At the hearing upon the adoptive mother's applications seeking to terminate all direct contact, she testified that the son struggled with any change in his routine, consistent with his diagnoses, and that he demonstrated significant behavioral issues following his visits with the biological mother. This testimony was supported by the testimony [*4]of a social worker who was engaged in treating the son.
The evidence concerning the daughter's reactions to the biannual visits was both quantitatively and qualitatively different. The counselor had no contact with the daughter and provided no testimony regarding her needs or interests. The biological mother described her visits, which consisted of two-hour intervals at a local park, with the children accompanied throughout by the adoptive parents. Both the adoptive mother and the biological mother testified that no issues arose during the visits. The adoptive mother testified that she observed no change in the daughter after the first visit, but that, following the second visit, the daughter "started head banging" and had two nightmares. After the third visit, she "continued the head banging which had stopped for a brief amount of time" and had nightmares. Following the final visit, the adoptive mother did not notice any behavioral changes, but the daughter had two nightmares.
Fully accepting Family Court's determination to credit the adoptive mother's testimony, any correlation between the brief, supervised visits and the daughter's harmful behavior is tenuous at best. The record contains no further information regarding the head banging, whether the daughter had nightmares at other times, or why the head banging would be attributed to the short visit with the biological mother, particularly if, as the testimony suggests, that behavior apparently continued for almost six months thereafter.[FN1] Indeed, as noted above, the adoptive parents were present for each visit, so the child was in proximity to familiar parental figures, and the adoptive mother's testimony indicated that nothing unusual or untoward occurred during the visits. The record further reveals that the biological mother was incarcerated for a period following the surrender agreement, arising from a violent altercation with the children's biological father. However heinous the biological mother's acts may have been, there was, again, no demonstrated connection in the record between this violent conduct and the best interests of the daughter. It remains possible that the daughter's best interests are impacted; nonetheless, we should not be approving the termination of the right to visitation based upon speculation. This sparse record fails to provide a sound and substantial basis upon which to find that the daughter's best interests require termination of the biological mother's biannual two-hour supervised visits with her.
Policy concerns underscore this conclusion; we believe that courts should adopt a careful and restrained approach in reviewing postadoption contact agreements, as the resulting deprivation from a lack of enforcement is significant and substantial. Accordingly, a brief review of the underlying law is merited. Voluntary surrenders can advance permanency goals for children who are in foster care by avoiding lengthy proceedings to terminate parental rights[*5], thereby facilitating more expeditious adoptions (see Joseph R. Carrieri, Practice Commentaries, McKinney's Cons Laws of NY, Book 52A, Social Services Law § 383-c at 135 [2010 ed]). Courts lack authority to order continued visitation with a parent who contests termination of parental rights and is unsuccessful after a hearing, but a parent who voluntarily surrenders a child may stipulate to conditions for postadoption contact (see Matter of Hailey ZZ. [Ricky ZZ.], 19 NY3d 422, 437-438 [2012]; Matter of William W., 23 AD3d 735, 736 [2005]; Matter of Jessi W., 20 AD3d 620, 621, 622 n 2 [2005]; see also Social Services Law § 383-c [2] [a], [b]; Matter of Carrie B. v Josephine B., 81 AD3d 1009, 1011 [2011], appeal dismissed 17 NY3d 773 [2011]). To be legally enforceable, the terms of an agreement between birth parents and adoptive parents regarding postadoption contact must be incorporated by a court into a written order, which can occur only if the agreement is in writing, is signed by the necessary parties, and the court that approved the surrender of the child expressly determined that such contact would then be in the adoptive child's best interests (see Domestic Relations Law § 112-b [2]; Matter of Andie B. [Lee J.—Hope C.], 102 AD3d 128, 129 [2012]; see also Social Services Law § 383-c [2], [3]). Even so, enforcement of a postadoption contact agreement "will only be ordered if it is determined to be in the child's best interests" at the time of the enforcement application (Matter of Andie B. [Lee J.—Hope C.], 102 AD3d at 129, citing Domestic Relations Law § 112-b [4]; accord Matter of Lynn X. [Joseph W.], 145 AD3d 1291, 1292 [2016]).
The right to enter into a postadoption contact agreement may encourage or induce parents to consent to a voluntary surrender of their parental rights (see Alan D. Scheinkman, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § 112-b at 224-225 [2010 ed]; Joseph R. Carrieri, Practice Commentaries, McKinney's Cons Laws of NY, Book 52A, Social Services Law § 383-c at 124 [2010 ed]). Where a biological parent makes the weighty decision to surrender rights to his or her child upon certain conditions, that individual is entitled to rely upon those conditions being met, and not being readily extinguished or set aside. Therefore, the agency and/or adoptive parents must endeavor to comply with any terms or conditions of an agreement. Although the agreement is subject to review upon a best interests standard (see Domestic Relations Law § 112-b [4]), the circumstances underlying and leading to such agreement should not be overlooked. When a postadoption contact agreement is entered and approved, there is often a pending proceeding to terminate parental rights or to adjudicate that the biological parent has abused or neglected the child. In such instances, the trial court is aware of the alleged parental shortcomings at that time and nevertheless concludes that the limitations imposed [*6]in the agreement adequately protect the child. Indeed, the court must expressly "determine[] and state[] in its order" approving the voluntary surrender that the specified postadoption contact would be in the child's best interests (Domestic Relations Law § 112-b [2]). It would thus be appropriate for a court addressing enforcement of such an agreement to expressly evaluate or analyze the change in circumstances upon these applications, as is customary upon custody modification petitions; there was no such analysis set forth in this matter.
Finally, it bears noting that Family Court's order did not address the provision in the postadoption contact agreements that the biological mother is entitled to photos and an update twice a year (in April and October), if requested from the local social services agency a month in advance (in March and September). Thus, the biological mother remains entitled to the benefits of these conditions. For the reasons above, we would affirm that part of the determination and the denial of further visitation with the son, but modify the order by reversing so much thereof as terminated visits between the biological mother and the daughter.
Aarons, J., concurs.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: The daughter was removed from the biological mother and placed in the adoptive mother's care when she was only three days old. Unlike the son, who may possibly have negative reactions to visits due to the traumatic impact of the biological mother's neglectful or abusive conduct while he was in her care, the daughter's reactions cannot be similarly attributed.