### In re Luke G. et al.*

SUPERIOR COURT

BRENNEMAN, J. In this action the plaintiff seeks to terminate the parental rights of the defendant, her former husband and the father of her three sons, alleging all of the nonconsensual grounds set forth in subsection (f) of General Statutes § 45-61f. The petition

---

* Thus entitled in accordance with the spirit and intent of General Statutes § 46b-124 and Practice Book § 1058.

was originally filed in the Probate Court while there was pending in the Superior Court the defendant's motion to restore his rights of visitation which had previously been terminated by order of that court. In connection with this visitation motion, the Superior Court granted the plaintiff's motion for a psychiatric evaluation of the defendant, to be conducted at his expense. The defendant's subsequent motion to transfer the termination matter to the Superior Court for Juvenile Matters was granted as a matter of right.

Evidence offered during two days of trial supports the finding of the following facts: Soon after the birth of the parties' third son, the plaintiff filed for dissolution of the marriage. The defendant filed no appearance, did not appear in court, and judgment was rendered by default. Custody of the children was awarded to the plaintiff with reasonable rights of visitation to the defendant, and title to the defendant's interest in the parties' jointly held realty was transferred to the plaintiff. Although the plaintiff was then netting $275 per week as a faculty member at Southern Connecticut State University and although the defendant reported later that he was then unemployed, the plaintiff requested and was awarded $40 per week for the support of each child. After the dissolution, the plaintiff permitted the defendant to remain in the family residence for approximately six months, during which time he shared child care responsibilities as the plaintiff requested.

After leaving the family home, the defendant exercised his unspecified rights of visitation sporadically. Although at trial the plaintiff testified that she questioned the father's poor judgment and unreliability (e.g., his failing to keep prearranged visitations and his appearing at other times without notice; his driving an unregistered motor vehicle; his taking the children hitchhiking when he had transportation problems; his

leaving the boys unattended for brief periods), she made no effort to limit his visitation rights but rather complained that he failed to visit as often as he could have done.

Some two years after the dissolution judgment was rendered, the defendant's financial problems had caused him to fall far in arrears in child support, but there had been no recourse to court by the plaintiff for enforcement of those orders. Seeking to avoid such court proceedings, the defendant promised to pay a large gas bill which had accrued since the dissolution. Although then earning $21,000 a year in her faculty position, the plaintiff had been unable or unwilling to take the necessary steps to ensure that there would be heat for the coming winter. Concerned with his inability to pay the bill soon enough to have the heat restored before an imminent cold spell, the defendant attempted to turn on the gas at the main on the street. With the plaintiff absent from the house, he proceeded to enter the basement and turn on the pilot light. When it failed to light, he concluded that his attempt at the main hydrant had failed. At that point, ordered out of the house by his former mother-in-law, he hastily retreated, neglecting to turn off the pilot light which he believed was not emitting gas. Hours later, it was discovered that the pilot light was on, filling the house with gas which might have ignited if corrective measures had not been taken in time. Two months later, the plaintiff filed a motion to enforce child support and, although she later testified that she never believed that the defendant had intended any harm but had merely acted irresponsibly, she accompanied her motion for contempt with a motion to terminate his visitation rights.

In the first hearing on these motions the defendant appeared without counsel and the matter was continued for him to obtain the services of an attorney. Three days before the continued hearing, the defendant had a hasty

parking lot conversation with the plaintiff's attorney, in which they agreed on a schedule for repaying the arrearage. The defendant denied that he was aware that two motions had been served on him, and, because the parking lot conversation related only to child support, he believed only that that matter would be before the court on the hearing date. On February 28, 1983, the defendant called the plaintiff's attorney from New York, saying that he could not attend the hearing. The attorney, accompanied by the plaintiff who was present throughout the hearing but who was not asked to testify, represented to the court that the defendant had not only agreed on the arrearage repayment schedule, but also "by agreement, Your Honor, the defendant agrees to have the order of reasonable visitation revoked." The plaintiff, although aware that the father did not wish to relinquish his visitation rights, sat silently in court and permitted the order terminating such rights to enter. She later explained to the children that the reason their father was no longer visiting was because she had gone to court and testified under oath in order "to protect them from their father."

The defendant did not learn for some weeks thereafter that he not only was ordered to pay an arrearage of $6500, but was also barred from seeing his children. He subsequently refused to sign the stipulation prepared by the plaintiff's counsel embodying those orders, and he soon retained counsel for the first time and filed the first of four motions seeking reinstatement of his right of visitation. Further, in addition to those motions, in the year preceding the filing of the termination petition he made other efforts to regain contact with his sons. His attorney made many efforts to contact the plaintiff's attorney by telephone and by letter, seeking restoration of visitation, and received no response. His attempts to telephone the children

were rebuffed by the plaintiff's second husband. Risking contempt of the court's order, he appeared without authorization at the children's schools on special occasions, such as their birthdays, and on Father's Day.

In response to his fourth motion for visitation, the court ordered weekly supervised visitation pending a study by the family relations office. This temporary order was subsequently modified, on the recommendation of the family relations officer, to allow visitation once every three weeks, still under supervision, for three hours each visit, pending receipt of the psychiatric evaluation and final resolution of the termination proceeding.

The psychiatric evaluation was eventually completed and admitted as child's exhibit A. The psychiatrist concluded that while the defendant "[was] still struggling to find new ways of coping with his current life situation" and still evidencing signs of impairment, he has shown considerable improvement in recent years. The father had demonstrated his love, interest and concern for his sons, but only a limited capacity to understand why they were reluctant to adhere rigidly to the court-ordered visitation schedule. The psychiatrist predicted that unsupervised visitation might increase the children's discomfort, but would not present them with any risk of physical harm. He recommended that the defendant "modify his attitude and behavior towards visitation" before changes were made in the current arrangement. The psychiatrist testified that a parent-child relationship did exist between the defendant and his sons, that their rapport was good and that the father related well to them. The observed strains in their relationship stemmed from the awkwardness of the mandated supervision of visits, the rigidity of the schedule, and the natural consequences of the eighteen month loss of contact. His testimony was unequivocal, however, that it would not be detrimental to allow time for

the parent-child relationship to rebuild; indeed, that it would be in the best interests of these children if such a relationship were to be reestablished. While the children might be disappointed if not permitted to be adopted by their stepfather, as had been discussed with them in that household for several years, such disappointment would be less damaging than to terminate the father's parental rights and thus engender long-term feelings of guilt and loss. He cited clinical research done among children of divorce showing that those who can maintain some relationship with their natural fathers do better than those who do not. In his opinion it would benefit all six of the persons involved to keep the legal tie between father and sons.

The psychiatrist found the defendant's emotional disorders, which were manifested by irresponsible actions or ill-advised judgments, to be his response to realistic "stressors" in his life—the dissolution; the plaintiff's remarriage; the loss of contact with his children; the attempt to terminate his parental rights permanently—and not the manifestation of any psychiatric disturbance. While his conduct might embarrass his children, it did not have any detrimental effect. The psychiatrist predicted that the children's negative reaction to his visits would diminish as the father's emotional state calms down, a process that would be expedited with counseling centered upon his interaction with the children. He disagreed with the plaintiff's contention that the defendant's struggle to keep his parental rights was based upon a desire for continued contact with his former wife. Unsupervised visitation was recommended as being beneficial to the children, but only after more "ground work" had been done. The "chant-like" response of the children to certain questions regarding their father, and the statement of one of them that having two "Daddies" was not a good idea because it was "too complicated" led the psychiatrist to specu-

late: "I'm not convinced of the independence of their judgment vis-à-vis their father." He concluded that terminating their father's parental rights, even for the purpose of adoption by their stepfather, would have a negative impact on the children, while permitting time for them to reestablish a relationship with him would be consistent with their best interests.

The facts found above lead to the following conclusions: While the defendant has repeatedly demonstrated poor judgment, an impulsive nature, and a reluctance to face unpleasant reality in the past, he has never presented any threat to the physical or emotional safety of his children. The only purpose served by supervision of visits is to allay anxiety. Such anxiety could be reduced with counseling of all parties so that visits could become unsupervised, flexible, and productive of the natural relationship that can exist between children and a noncustodial parent. Severing the father-son relationship through termination of parental rights would be detrimental to the children; permitting time to reestablish such a relationship would be beneficial. While the defendant is more stable psychologically than he was at the times of the dissolution and of the "gas incident," he would still benefit from psychotherapy to complete his emotional disengagement from the plaintiff and to facilitate the resumption of a more comfortable relationship with his children. The children presently regard the inflexible schedule of supervised visitation as "a pain," but are not harmed by it. Their attitude is a natural consequence of the unjustifiable eighteen month hiatus of visitation during which contact with their father was barred by an order unjustified by the circumstances; their father became known to them as a "complication" known by his first name, while their stepfather was enabled to assume the role of "Daddy"; and adoption was openly discussed in the plaintiff's home. A more flexible schedule of visitation

under increasingly normal (e.g., unsupervised, off-premises, overnight) circumstances would be beneficial to the children.

A finding that statutory grounds exist to terminate a parent's rights must be made by clear and convincing proof of facts existing on the date the petition was filed. In this case, the date the case was transferred to this court, is taken as such date. Without such a finding, no inquiry may be made as to the ultimate best interests of the children. *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 673, 420 A.2d 875 (1979).

The plaintiff has alleged three grounds for termination. The first is abandonment. There is no question that the defendant has been chronically in arrears on child support since the time of the dissolution. This is but one of many indicia of "interest, concern or responsibility" that must be scrutinized in determining if there is clear and convincing evidence that the defendant has "failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child" within the meaning of General Statutes § 45-61f (f). Even if the defendant had, as claimed by the plaintiff's attorney, agreed to forego visits for a period after the "gas incident," within a few weeks after receiving the order revoking his visitation rights he began a sixteen month saga of attempts to have contact with his children which culminated in the interim order restoring those rights. He engaged counsel who filed motions and attempted contact with the plaintiff; he risked citations of contempt by appearing without authorization at places where he thought he might see his children; he sent cards and gifts that the children told him they had not been given by their mother; he tried to talk to them on the telephone on Christmas eve and Christmas day and was disconnected by the children's stepfather. His emotional upset and poor judgment rendered those efforts ineffectual in the face of the plaintiff's stead-

fast determination to insulate the children from their father, to prevent him from interfering with the "good thing going" in her household. But the defendant's efforts clearly demonstrate an unflagging resolve to resume the connection with his children which was severed by the order revoking his visitation rights. Staying away from children in response to a court order barring visitation cannot be deemed the clear and convincing proof of abandonment required to terminate parental rights.

The second ground for termination alleged by the plaintiff involves acts of commission or omission. This ground is clearly inapplicable where a custodial parent seeks to terminate the rights of a noncustodial parent, particularly when the noncustodial parent is barred by court order from exercising any "care, guidance or control." While serious physical abuse at the hands of a noncustodial parent might be regarded as "prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights," no such episodes are in this case. The legislative history of § 45-61f (f) makes it clear that it was added to the law so that seriously abused children could be removed permanently from the care of the parent inflicting such abuse. See, e.g., *In re Theresa S.*, 196 Conn. 18, 491 A.2d 355 (1985). No such acts are here alleged. The irresponsible behaviors of the defendant, including his abortive effort to provide heat for his children, do not provide clear and convincing proof of this ground for termination of his parental rights.

The third ground alleged by the plaintiff in favor of termination is lack of an ongoing parent-child relationship. There can never be, between children and their noncustodial parent, an "ongoing parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day to day basis the physical, emotional,

moral and educational needs of the child." This ground, as applied to noncustodial parents, must be interpreted in the light of circumstances that actually pertain where children only see such parent during permitted visitation. The psychiatrist who examined the defendant found that a relationship existed between the boys and their father, one beneficial to the children and one that could be strengthened if all the adults involved would be willing to temper their conduct to facilitate it. Further, with regard to the second prong of this ground— that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child"—it is clear from the only objective, expert testimony in the case that to reestablish such relationship would not only not be detrimental to the best interests of these children but would, in fact, be clearly beneficial.

Since the plaintiff has failed to establish by clear and convincing proof any one of the three grounds pleaded, it is not necessary to consider whether, on facts up to the final date of hearing, termination would be in the children's best interests. It must be noted, however, that even if grounds to terminate had been found, the court would be required to consider, as one of six elements in disposition, the following: "(6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent . . . ." General Statutes § 45-61f (h). The plaintiff here obtained an order barring the defendant from all visitation with his children as a result of a single "incident" that accidentally put the children in jeopardy for a few hours. By her own admission, it was irresponsible, not intentional. A less Draconian solution would have been to seek an order for supervised visitation. Instead, knowing his propensity to avoid unpleasantness and the unlikelihood of his coming to court, she obtained a com-

plete bar to his visitation. Under all of the circumstances, this may be considered to be an unreasonable obstruction to the maintenance of a meaningful relationship between father and sons, sufficient to have defeated the relief sought.

The petition is therefore dismissed.

· The dismissal ends the possibility that the defendant's motion to restore visitation, still pending in this court and presently under temporary orders, will be moot. Therefore, pursuant to the recommendation of the family relations officer, that motion is herewith referred back to that officer for further review and recommendations in light of this decision, and in light of the psychiatrist's report and testimony. In that testimony, the psychiatrist set forth suggestions for ensuring that the children may resume a normal relationship with their natural father while continuing to thrive in the security of the home of their custodial mother. He suggested both that the defendant should resume psychotherapy to gain insight into his own needs and those of his children, as well as control over his responses to those needs and that the plaintiff and her husband should help the children accept their situation by engaging in family counseling. One further suggestion is based upon the testimony in the termination trial. That is that the plaintiff and her husband should cease giving the children any further negative messages regarding their father, such as permitting them to refer to him by his first name rather than as "Daddy," "Father" or "Papa"; referring to the defendant's attempts to become reinvolved with them as "interfering," a threat to "mess up a good thing" in the mother's household; and suggesting that their father is a threat to their physical safety.

It is the responsibility of all of the adults involved to give the children's interests top priority over their

own emotional objectives, so that they may understand and benefit from the fact that they have two "Daddies" who love them, that having two "Daddies" is not "too complicated" but is rather an enriching factor in their lives.

To this end it is ordered that the family relations office, pursuant to its recommendation of last October, review this case and make further recommendations for a final order on the defendant's motion.