******************************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.

******************************************************

KELLER, J., with whom KAHN, J., joins, concurring. I agree with and fully join in part I of the majority opinion, which determines that the Appellate Court correctly affirmed the trial court's judgment insofar as it terminated the parental rights of the respondents, Valerie H. and Anthony J., as to their minor child, Annessa J., by way of a virtual trial. I also agree with the result the majority reaches in part II of its opinion—that the Appellate Court improperly reversed the judgment of the trial court insofar as it denied the respondents' motions for posttermination visitation with Annessa on the ground that the trial court applied an incorrect legal standard rather than the standard required under *In re Ava W.*, 336 Conn. 545, 248 A.3d 675 (2020).

Although the petitioner, the Commissioner of Children and Families, has not requested reconsideration of *In re Ava W.*, I write separately to address that matter because I am convinced that the questions presented in part II of the majority opinion are the manifestation of the first of many issues that will arise if this court does not reconsider the holding in *In re Ava W.* that General Statutes § 46b-121 (b) (1) provides the Superior Court with authority in juvenile matters to order posttermination visitation prior to the rendering of a final judgment terminating parental rights.[1] See id., 585, 590 n.18. I use this concurrence to explain how the court in *In re Ava W.* misinterpreted the common law and the statutory scheme and, more importantly, how its holding threatens to undermine the public policy that the statutory scheme is intended to advance. The court in *In re Ava W.* not only decreed the validity of posttermination visitation orders previously uncontemplated in our courts,[2] the logistics of effectuating this change in our jurisprudence could lead to potentially disruptive change and the attendant psychological and economic costs to children, foster parents, preadoptive and adoptive parents, the Department of Children and Families, and the courts. As I am nonetheless mindful that *In re Ava W.* is currently controlling precedent, I also suggest two important clarifications that this court could make to minimize some of its potentially disruptive effects.

I

Section 46b-121 (b) (1) provides in relevant part: "In juvenile matters, the Superior Court shall have authority to make and enforce such orders directed to parents . . . guardians, custodians or other adult persons owing some legal duty to a child therein, as the court deems necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child subject to the court's jurisdiction or otherwise committed to or in the custody of the Commissioner of Children and Families. . . ."

## A

I begin with the legal underpinnings of the decision in *In re Ava W.* The court in *In re Ava W.* began its analysis with the premise that the authority to order posttermination visitation existed at common law. See *In re Ava W.*, supra, 336 Conn. 569. After surveying early English and Connecticut case law, the court concluded: "These cases suggest that, under our common law, courts had broad authority to act in the child's best interest in juvenile matters. More specifically, we are able to glean from historical cases that, as part of their common-law authority, our courts contemplated termination and limitation of parental rights (described at the time as custody and modification of custody)." Id., 570–71.

The court then interpreted § 46b-121 (b) (1), and its predecessors dating back to 1921, as a codification of this broad common-law authority. Id., 549, 571–72. As proof of this fact, the court pointed to the statutory text authorizing the trial court to issue any order that it deems "necessary *or* appropriate" and the fact that the scope of the statute is extended to any "adult persons owing some legal duty to a child" rather than being limited to parents. (Emphasis in original; internal quotation marks omitted.) Id., 572. The court then observed: "Although § 46b-121 (b) (1) does not expressly mention orders for posttermination visitation, neither does it expressly preclude that authority. In our view, a broad statutory grant of authority and a lack of limiting language . . . supports [a] conclusion that the Superior Court has the authority to issue such an order." (Internal quotation marks omitted.) Id., 572–73.

The court in *In re Ava W.* thus reasoned that the legislature's failure to "abrogate" the trial court's common-law authority to regulate visitation requires this court to interpret § 46b-121 (b) (1) to encompass posttermination visitation. Id., 574. The court pointed to *Michaud* v. *Wawruck*, 209 Conn. 407, 551 A.2d 738 (1988), in which a posttermination visitation agreement between the former parent[3] and adoptive parents was deemed enforceable, as further evidence that the legislature had not "expressly abrogated the authority to make or enforce orders regarding posttermination visitation." *In re Ava W.*, supra, 336 Conn. 576.

Finally, the court in *In re Ava W.* considered whether the statutory provisions governing cooperative postadoption visitation agreements between parents and prospective adoptive parents, enacted after *Michaud*; see General Statutes § 17a-112 (b) through (h); "abrogated a court's common-law authority to issue orders in juvenile matters and thus serves as a limitation on the court's authority to order posttermination visitation." *In re Ava W.*, supra, 336 Conn. 579. The court pointed out that the operation of § 17a-112 (b), which

applies to proceedings to terminate parental rights, is limited in scope and does not apply to contested posttermination visitation orders. Id., 580. Because the court viewed the provisions governing the cooperative agreements to control a narrower subset of circumstances than those under § 46b-121 (b) (1), it determined that the rule of construction under which a more specific statute relating to a particular subject matter will control over a more general statute that might apply was not controlling. Id., 582. The court also pointed to statutory text providing that "[cooperative postadoption agreements] shall be in addition to those under common law" as evidence that the legislature did not intend to abrogate the common law. (Internal quotation marks omitted.) Id., 580, quoting General Statutes § 17a-112 (b).

B

The cases cited by the court in *In re Ava W.* support the proposition that courts historically exercised common-law authority to ensure care for neglected or abused children and to remove a child from unfit parents' custody. Id., 569–71. The court in *In re Ava W.* did not, however, cite a single case in which the court exercised common-law authority to order that parental visitation be provided with a child removed from the parent's custody.

An authoritative treatise that addresses the origins and limits of the court's equitable jurisdiction explains that this jurisdiction "extends to the care of the person of the [child], so far as is necessary for his protection and education; and to the care of the property of the [child] for its due management, and preservation, and proper application for his maintenance." 2 J. Story, Commentaries on Equity Jurisprudence, as Administered in England and America (2d Ed. 1839) § 1341, p. 573; see also id., § 1333 p. 561 (acknowledging that long-standing equitable jurisdiction over persons and property of children flows from crown's "general power and duty, as parens patriae, to protect those, who have no other lawful protector"). When the father is unfit to protect and provide education for his child,[4] the court will "deprive him of the custody of his children, and appoint a suitable person to act as guardian, and to take care of them, and to superintend their education." Id., § 1341 p. 575. Although the treatise indicates that the court had jurisdiction to direct the guardian to take actions necessary to the child's maintenance, care, or education (typically for the benefit of children who come from families with means); see id., § 1337 p. 570; id., § 1338 pp. 570–71; id., § 1349 p. 579; id., § 1351 p. 580; id., § 1354 p. 582; the subject of visitation is never mentioned.

This omission is not surprising. Although the father's custody could be restored by way of a habeas petition upon proof of fitness; *Kelsey* v. *Green*, 69 Conn. 291,

298, 301, 37 A. 679 (1897); neither the state nor the court had any obligation to aid family reunification. It was not until 1923 that the United States Supreme Court held that parents have a constitutionally protected interest in the care and control of their children; see *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 401, 43 S. Ct. 625, 67 L. Ed. 1042 (1923); and not until 1972 that such rights were recognized in the context of custody and visitation decisions; see *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); long after our legislature adopted a statutory scheme to address the care and custody of neglected, uncared for, and abused children.[5] See General Statutes (1854 Rev.) tit. VII, c. 6, § 35.

Another essential fact that must be considered is that the concept of termination of parental rights, as it is understood today, was unknown to the common law. See *Woodward's Appeal*, 81 Conn. 152, 166, 70 A. 453 (1908) ("A . . . parent has certain legal rights in respect to his children during minority. But these rights are not absolute rights, they may be forfeited by his own conduct, they may be modified or suspended against his will by action of the court, they may to a certain extent be transferred by agreement to another, but *they cannot be destroyed as between himself and his child, except by force of statute*." (Emphasis added.)). The child's care and custody could be vested in a guardian, but guardianship did not terminate the father's obligation to provide for the child's support; see *Stanton* v. *Willson*, 3 Day (Conn.) 37, 57–58 (1808); see also *Penfield* v. *Savage*, 2 Conn. 386, 387 (1818) ("a guardian is not bound to support his ward out of his own estate"); nor did it preclude restoration of the parents' custody. Similarly, adoption of children removed from their parents' custody was not recognized under the common law. See *Woodward's Appeal*, supra, 164–65 (construing Wisconsin statute similar to Connecticut's adoption statute and explaining that "courts in applying statutes of this kind have held that the power to so adopt minor children is a creation of the statute *unknown to the common law* . . . and that an adoption is invalid unless made in pursuance of the essential requirements of the statute" (emphasis added)); see also *Goshkarian's Appeal*, 110 Conn. 463, 473–77, 148 A. 379 (1930) (*Wheeler, C. J.*, dissenting) (discussing history of Connecticut adoption law from 1864 to 1930). Given the absence of any common-law procedure to terminate parents' rights vis-à-vis their children or to effectuate adoptions, statutes purportedly codifying the court's common-law authority could not have included (or contemplated) authority to grant posttermination visitation.

There can be no doubt that the statutory scheme governing neglected and abused children expanded on the court's common-law authority. In our earliest statutes, parents were designated as their children's "guardians" and could be removed as such by the Probate

Court if the children had been abandoned or neglected, or the parent was otherwise unfit. See General Statutes (1866 Rev.) tit. XIII, c. 5, § 68; General Statutes (1854 Rev.) tit. VII, c. 6, § 35. The newly appointed guardian was granted "control of the person of such minor, and the charge and management of his estate; and a guardian so appointed shall have the same power over the person and property of such minor, as guardians of minors whose parents are deceased." General Statutes (1866 Rev.) tit. XIII, c. 5, § 68. The Probate Court was given authority to approve an adoption agreement between the child's newly designated guardian and a third party. See General Statutes (1875 Rev.) tit. XIV, c. 4, §§ 1 and 2. Approval of the adoption agreement rendered the adoptive parents the legal parent of the child with all of the rights and duties of a "legitimate" parent. General Statutes (1875 Rev.) tit. XIV, c. 4, § 2. It is thus fair to infer that adoption extinguished all legal rights and obligations of the child's parents with respect to their child.[6] There is neither a textual basis nor case law from which an inference can be drawn, however, that the Probate Court had authority, in connection with its approval of the adoption agreement, to order the adoptive parents to provide visitation with the child's former parents.

In 1921, the legislature created the juvenile courts and provided such courts with the broad grant of authority to issue orders to parents and persons owing a legal duty to the child that are necessary or appropriate to secure the support or welfare of the child—the predecessor to § 46b-121 (b) (1).[7] See Public Acts 1921, c. 336, § 3. *A procedure to terminate parental rights prior to adoption still did not exist.* This statutory grant of authority could not, therefore, have been intended to include orders for posttermination visitation.

A procedure to terminate parental rights, prior to adoption, was not enacted until almost *four decades* later. See Public Acts 1959, No. 184. The legislative history reveals that the purpose of this procedure was to end the disruptive practice of parents filing petitions to revoke their child's commitment to the commissioner's predecessor after a required trial period for an adoptive placement began. See Conn. Joint Standing Committee Hearings, Public Welfare and Humane Institutions, 1959 Sess., pp. 34–36, remarks of Assistant Attorney General Ernest Halstead on behalf of the Commissioner of Welfare. Not long thereafter, the legislature defined "termination of parental rights" to make clear that it means "the *complete severance* by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . ." (Emphasis added.) Public Acts 1965, No. 488, § 1; see Public Acts 1974, No. 74-164, § 1 (expanding on that definition by adding "so that the child is free for adoption"); see also General Statues § 17a-93 (5) (current codification

of definition). Relying on a similarly worded statute, the Maine Supreme Judicial Court reasoned: "The plain language of this section mandates that a termination order sever the relationship between parent and child. The court's attempt to terminate the mother's rights to her children and concomitantly to preserve her relationship with them by requiring the [relevant state agency] to provide for continuing visitation was beyond its authority." *In re Melanie S.*, 712 A.2d 1036, 1037–38 (Me. 1998).

Thus, it was made plain and unambiguous as of 1965 that the trial court had no authority under § 46b-121 (b) (1) to direct orders to former parents whose parental rights had been terminated. Severance of their responsibilities to the child meant that they were no longer "adult persons owing some legal duty to a child . . . ." General Statutes § 46b-121 (b) (1). The court's reliance in *In re Ava W.* on this language as support for a court's authority to issue posttermination orders for the benefit of the former parent is therefore misplaced.[8]

Subsequent changes to the statutory scheme with regard to termination of parental rights provide further evidence that the grant of authority in § 46b-121 (b) (1) was not intended to authorize the trial court to issue posttermination visitation orders. The legislature also provided authority to the Probate Court to adjudicate certain petitions for termination of parental rights. See General Statutes § 45a-715. It did not provide the Probate Court with authority similar to that under § 46b-121 (b) (1). Consequently, under the interpretation of the scheme by the court in *In re Ava W.*, the availability of posttermination visitation would depend on the forum in which the petition for termination of parental rights was adjudicated.[9] A construction of § 46b-121 (b) (1) under which it does not include authority to order posttermination visitation would render the termination scheme in harmony. See, e.g., *In re Jusstice W.*, 308 Conn. 652, 663, 65 A.3d 487 (2012) ("the legislature is always presumed to have created a harmonious and consistent body of law" (internal quotation marks omitted)).

Yet another significant change was the addition of authority for the trial court to appoint a "statutory parent" for the child following termination of parental rights, typically the commissioner. See General Statutes §§ 17a-93 (6), 17a-112 (m), 45a-717 (f) and (g), 45a-718 and 46b-129b (a). This appointment allowed the statutory parent to assume the role previously played by the legal parent and thereby served as a further backstop against the former parent's efforts to impede adoption. See General Statutes § 45a-718 (b) ("[t]he statutory parent shall be the guardian of the person of the child, shall be responsible for the welfare of the child and the protection of the child's interests and shall retain custody of the child until the child attains the

age of eighteen unless, before that time, the child is legally adopted or committed to the [c]ommissioner . . . or a licensed child-placing agency"); see also 16 S. Proc., Pt. 3, 1973 Sess., p. 1434, remarks of Senator George C. Guidera (describing steps in adoption process as termination of parental rights, appointment of a statutory parent, and then adoption proceedings, and explaining that "[t]he concept of a statutory parent is new in the law and is necessary in order to effectuate a greater degree of finality in adoptions"). The legislature thereby expressed its clear intention that the statutory parent would have control over the decision whether posttermination visitation, or any other form of contact with the former parent, was in the child's best interest. See *In re Nayya M.*, Docket No. H12-CP-10-012977-A, 2012 WL 2855816, *31 (Conn. Super. June 7, 2012) (ordering that "[a]ny future contact between the children and any of the respondent parents shall be left to the [commissioner's] or subsequent adoptive parents' informed discretion"); *In re Andrew C.*, Docket No. H12-CP-11-013647-A, 2011 WL 1886493, *15 (Conn. Super. April 19, 2011) (listing nine trial court decisions holding that judgment terminating parental rights allows legal authority over children to be vested in statutory parent or adoptive parents regarding decisions about children's future life and their contact with others); see also *Division of Youth & Family Services* v. *B.G.S.*, 291 N.J. Super. 582, 594–96, 677 A.2d 1170 (App. Div. 1996) (authority to allow posttermination visitation rests exclusively with state child protection agency).

The clearest indication that the court misinterpreted § 46b-121 (b) (1) in *In re Ava W.*, however, may be the plain and unambiguous evidence that the legislature considered posttermination visitation for a parent whose rights have been terminated and provided the trial court with authority to grant it in only one circumstance: cooperative postadoption agreements.[10] See General Statutes § 17a-112 (b) through (h); see also General Statutes § 45a-715 (h) through (s) (granting similar authority to Probate Court). As important as the fact that the legislature provided such authority is the extent to which it prescribed substantive and procedural criteria to guide and limit the exercise of that authority.[11] The legislature prescribed the circumstances under which such agreements would be subject to approval (e.g., parent agrees to voluntary termination of parental rights) and the necessary terms of such agreements (e.g., parent's acknowledgment that adoption is irrevocable, even if adoptive parents violate agreement). See General Statutes § 17a-112 (b) through (e). It protected the adoptive parents' right to change their residence after executing the agreement. See General Statutes § 17a-112 (f). The legislature not only provided procedures for the approval of the agreement and its incorporation into the final order terminating parental rights,

but also anticipated and provided guidance regarding disagreements between the parties and changed circumstances. See General Statutes § 17a-112 (c), (f), (g) and (h). Surely, if the legislature enacted provisions protecting intended adoptive parents who willingly enter into a postadoption agreement, it would have afforded adoptive parents equivalent protections when there is no such cooperation if it actually thought that the law already permitted or should be amended to permit the unilateral imposition of posttermination visitation orders. See *In re K.H.*, Docket No. 2019-258, 2019 WL 6048913, *3 (Vt. November 14, 2019) (concluding that trial court properly concluded that it had no authority to order ongoing contact posttermination in light of statute that provided for postadoption contact orders pursuant to agreement between biological parents and intended adoptive parents); see also *In re Hailey ZZ.*, 19 N.Y.3d 422, 437, 972 N.E.2d 87, 948 N.Y.S.2d 846 (2012) ("the open adoption concept would appear to be inconsistent with this [s]tate's view as expressed by the [l]egislature that adoption relieves the biological parent of all parental duties toward and of all responsibilities for the adoptive child over whom the parent shall have no rights" (internal quotation marks omitted)).

To the extent that the court in *In re Ava W.* relied on *Michaud* and a sentence in the statutes preserving common-law postadoption visitation agreements as support for its interpretation of § 46b-121 (b) (1), that reliance is misplaced. *Michaud* involved a common-law breach of contract action, predating the cooperative adoption agreement statutes, that challenged the adoptive parents' repudiation of a visitation agreement executed after parental rights were terminated. *Michaud* v. *Wawruck*, supra, 209 Conn. 408–409. It hardly provides evidence that the legislature had not "expressly abrogated the [court's] authority to make or enforce orders regarding posttermination visitation." *In re Ava W.*, supra, 336 Conn. 576. As I previously explained, there was no such common-law authority to be abrogated. Moreover, *Michaud* did not involve the exercise of the court's authority in a juvenile matter but, rather, its authority to enforce a common-law contract. The legislature's subsequent adoption of language providing that "[cooperative postadoption] agreement[s] shall be *in addition to those under common law*"; (emphasis added) General Statutes § 17a-112 (b); accord General Statutes § 45a-715 (h); similarly refers to extrajudicial agreements, like the agreement in *Michaud*, between private parties. This language does not refer to posttermination visitation compelled over the objection of the statutory parent or the child's adoptive parents. See *In re Shane F.*, Docket Nos. 26623-1-111 and 26624-1-111, 2009 WL 44818, *5–6 (Wn. App. January 8, 2009) (decision without published opinion, 148 Wn. App. 1004) (statute providing that " '[n]othing in this chapter shall be construed to prohibit the parties to a proceeding

under this chapter from entering into agreements regarding communication with or contact between child adoptees, adoptive parents, and a birth parent or parents' " did not support judicially mandated post-adoption visitation).

In sum, there is not a single case or a shred of historical or textual evidence demonstrating that trial courts had authority to order posttermination visitation under the common law or were given such authority by statute. The historical record reflects that § 46b-121 (b) (1) had never previously been utilized by the courts to permit an order of posttermination visitation; it had been used to issue orders to address matters that arose during the course of child protection proceedings as they continued toward their ultimate and final goal: a safe, permanent situation for the child—either reunification with a parent or the placement in a permanent home, preferably an adoptive home—and an end to the state's involvement. This provision allows the court to direct orders to the commissioner, parents whose rights are still intact and who are still striving to achieve restoration of the normal family unit, foster parents, and any other person who continues to owe some duty to the child.

C

The interpretation of § 46b-121 (b) (1) as allowing posttermination parental rights to visitation is also inconsistent with the policies that the legislative scheme is intended to implement. It is important to recognize at the outset that there should be few cases in which court-ordered, posttermination visitation could be deemed "necessary or appropriate to secure the [child's] welfare"; General Statutes § 46b-121 (b) (1); *regardless of what that standard means.* There are three principal reasons why this is so. The first is the nature of the clear and convincing proof that is required to terminate parental rights. This proof consists not merely of evidence that the parent has engaged in conduct that was harmful, or is likely to cause harm, to the child and has shown unwillingness or incapacity to change that conduct;[12] see General Statutes § 17a-112 (j); but also that termination of parental rights is in the child's best interest. See General Statutes § 17a-112 (j); see also General Statutes § 45a-717 (g). Most of these cases do not present circumstances in which an order of posttermination visitation would ever be appropriate. The second reason is that, in the absence of actual abuse, the court would be less likely to find that termination of parental rights is in the child's best interest if the child's chances of securing a permanent placement are remote (e.g., child is much older, has severe behavioral or medical issues, etc.), the child retains a strong attachment to the parent, and the parent has, to the best of his or her ability, maintained contact with the child. See General Statutes § 17a–112 (k) (4) through

(7);[13] see also S. Williams, Child Trends, State-Level Data for Understanding Child Welfare in the United States (February 28, 2022), available at https://www.childtrends.org/publications/state-level-data-for-understanding-child-welfare-in-the-united-states (last visited June 16, 2022) (providing federal fiscal year 2018, state by state statistics of children adopted and waiting to be adopted, demonstrating that, as age increases, average length of stay in foster care waiting to be adopted increases). One option if ongoing contact is appropriate is for the court to appoint a permanent legal guardian for the child in lieu of termination; see General Statutes § 46b-129 (j); a status that would allow the court to exercise its authority under § 46b-121 (b) (1) to order visitation.[14] See, e.g., *In re Mason S.*, Superior Court, judicial district of Hartford, Juvenile Matters, Docket No. H12-CP-17-16981-A, (May 30, 2017); *In re Nyara J.*, Superior Court, judicial district of Hartford, Juvenile Matters, Docket Nos. H12-CP-08-012242-A and H12-CP-08-012243-A (September 22, 2016). The third reason is that, if the court nonetheless orders termination under such circumstances, the commissioner, as statutory parent, is likely to voluntarily allow some form of posttermination contact or communication between the parent and the child, if it is in the child's best interest and the parent is willing and able to act in a cooperative manner. Thus, cases in which court-ordered, posttermination visitation could be viewed as necessary or appropriate to secure the child's welfare will likely be a distinct minority. Whether the legislature intended to provide authority for the trial court to order posttermination visitation must, therefore, be considered against this backdrop.

This court also should consider whether court-ordered, posttermination visitation would be generally consistent with the purpose of termination of parental rights. Cf. *In re Eden F.*, 250 Conn. 674, 692, 741 A.2d 873 (1999) (considering whether court's interpretation of § 17a-112 was in accordance with public policy declared by legislature in General Statutes § 17a-101). Termination of parental rights is intended to foster permanency and stability for the child. See, e.g., *In re Nevaeh W.*, 317 Conn. 723, 731–33, 120 A.3d 1177 (2015); *In re Davonta V.*, 285 Conn. 483, 494–96, 940 A.2d 733 (2008). Adoption is the preferred outcome; see *In re Adelina A.*, 169 Conn. App. 111, 121 n.14, 148 A.3d 621 ("[t]he Adoption and Safe Families Act (ASFA), Pub. L. No. 105-89, 111 Stat. 2115 (1997), and parallel state law . . . [have] established a clear preference for termination followed by adoption when reunification with a parent is not a viable permanency plan"), cert. denied, 323 Conn. 949, 169 A.3d 792 (2016); and, in accordance with federal law, Connecticut's statutory scheme provides an expedited schedule to make a permanent placement for a child for whom reunification is not an appropriate option. See id., 122–23.

Just as failure to terminate parental rights may have an adverse effect on a child's need for permanency and stability, so, too, may permitting posttermination visitation, particularly with children who are too young or psychologically frail to understand that the parent they continue to have contact with will never resume his or her parental role. The schism created by any conflict between the parent and a foster or adoptive parent also can prove disruptive to the children and their caretakers or new family.[15] See, e.g., *In re Omar I.*, 197 Conn. App. 499, 533, 231 A.3d 1196 (respondent father sent threatening e-mail to foster parents accusing them of emotional abuse and of alienating children from him), cert. denied, 335 Conn. 924, 233 A.3d 1091, cert. denied sub nom. *Ammar I.* v. *Connecticut*, U.S. , 141 S. Ct. 956, 208 L. Ed. 2d 494 (2020); *In re Joseph W.*, 53 Conn. Supp. 1, 79, 79 A.3d 155 (2012) (respondent parents drove to foster home, pounded on doors, shouted child's name, and demanded to know where child was, terrifying foster parents' child who was home alone), aff'd, 146 Conn. App. 468, 78 A.3d 276, cert. denied, 310 Conn. 950, 80 A.3d 909 (2013) and cert. denied, 310 Conn. 950, 80 A.3d 909 (2013); *In re Guilherme F.*, Superior Court, judicial district of Middlesex, Child Protection Session at Middletown, Docket Nos. H12-CP-04-010032-A and H12-CP-05-010590-A (January 3, 2008) (foster placement was disrupted when respondent mother made referral to department hotline making unsubstantiated allegations that children were being abused by foster parents). Posttermination visitation thus poses the risk of impinging on foster families and deterring their willingness to foster children.

Similarly, posttermination visitation may derail adoption or reduce the children's opportunities to be placed in permanent homes and, if they are adopted, may threaten the integrity of the new family unit. See *People ex rel. M.M.*, 726 P.2d 1108, 1125 (Colo. 1986) (characterizing posttermination visitation order as "impediment to adoption"). Prospective adoptive parents may be reluctant or unwilling to facilitate contact between a child and a former parent who has exhibited problematic behaviors that justified the loss of his or her parental rights.[16] The prospect of having to initiate a court action to revoke the visitation order or getting hauled into court to answer a motion for contempt for refusing to provide postadoption visitation may be a significant deterrent to adoption. The commissioner may thus feel compelled to limit the department's pool of potential adoptive parents to those who will agree to an open adoption.

Even under the best of circumstances, it is inevitable that disagreements and changes in circumstances will arise after posttermination visitation commences. It is not speculative to assume that compelled orders of visitation following a contested termination of parental

rights will lead to repetitive motions for contempt and modification. This consequence will require the assignment of more judges to our already overburdened docket for juvenile matters. It also will impose a burden on foster parents and adoptive parents to initiate court action to modify or revoke the visitation order or require them to respond to court action initiated by the former parent.[17]

I am aware that there is some legal scholarship supporting the position that maintaining a relationship with the biological family can be beneficial to a child following termination of parental rights. See, e.g., National Council of Juvenile and Family Court Judges, Forever Families: Improving Outcomes by Achieving Permanency for Legal Orphans, (April, 2013) p. 18, available at https://www.ncjfcj.org/wp-content/uploads/2013/04/LOTAB_3_25_13_newcover_0.pdf; K. Foehrkolb, Comment, "When the Child's Best Interest Calls for It: Post-Adoption Contact by Court Order in Maryland," 71 Md. L. Rev. 490, 524–28 (2012); A. Williams, Note, "Rethinking Social Severance: Post-Termination Contact Between Birth Parents and Children," 41 Conn. L. Rev. 609, 617–19 (2008); see also *State ex rel. Amy M.* v. *Kaufman*, 196 W. Va. 251, 260, 470 S.E.2d 205 (1996) ("even where termination of parental rights is justified, a continued relationship between parent and child by means of post-termination visitation may be valuable to the child's emotional well-being"). In response, I offer two observations about ways in which such a relationship could be fostered that are likely to be far less intrusive and disruptive to the child's permanent placement than court-ordered visitation with the former parent. First, a relationship with the child's biological family may be fostered through connections with relatives other than the child's former parent. There are statutory provisions that address sibling contact, for example. See footnote 10 of this opinion. Second, a less intrusive connection could be maintained with a former parent (or other relatives) by means other than face-to-face visitation. As the cooperative postadoption agreement statutes recognize, a relationship may be maintained through "*communication or* contact . . . ." (Emphasis added.) General Statutes § 17a-112 (b) and (c); General Statutes § 45a-715 (h) and (i). Presumably, visitation is contact. Communication would include oral or written communication, whether by phone, mail, or electronic means.

Ultimately, however, "it is a question of public policy how best to strike the appropriate balance between and among the competing values and interests at stake, *and,* '[i]n areas where the legislature has spoken . . . the primary responsibility for formulating public policy must remain with the legislature.' State* v. *Whiteman,* 204 Conn. 98, 103, 526 A.2d 869 (1987)." (Emphasis added.) *In re Tresin J.*, 334 Conn. 314, 340, 222 A.3d 83 (2019) (*Ecker, J.*, concurring). The legislature has spoken with regard to the issue of posttermination visi-

tation. "Th[e] definition [of termination of parental rights] does not confer upon the courts any license to go beyond the statutory language in this delicate and sensitive area." *In re Juvenile Appeal (83-BC)*, 189 Conn. 66, 89, 454 A.2d 1262 (1983) (*Healey, J.*, dissenting); see also *In re Hailey ZZ.*, supra, 19 N.Y.3d 438 (recognizing that legislature was "the entity best suited to balance the critical social policy choices and the delicate issues of family relations involved in such matters . . . [and it] has not sanctioned judicial imposition of posttermination contact where parental rights are terminated after a contested proceeding" (citation omitted; internal quotation marks omitted)).

II

The court's holding in *In re Ava W.*, however, is presently controlling precedent. There are nonetheless two steps that this court could take to clarify that decision to minimize some of the concerns that I have identified.

The first step would be to give a contextual meaning to the "necessary or appropriate" standard under § 46b-121 (b) (1) that fits the nature of the order at issue. These terms lack any fixed meaning, and what is necessary or appropriate in any given case may differ. "Appropriate" may be a perfectly serviceable standard when assessing whether to order the department to provide the child with a computer for school work; it is less so when assessing whether posttermination visitation should be ordered in light of the concerns discussed in part I C of this opinion.

I would interpret posttermination visitation over the objection of the presumptively fit statutory parent to be "appropriate" only when it is "necessary" (or simply that "necessary" is the governing standard in this context).[18] In turn, I would at least interpret "necessary" to be functionally equivalent to the standard that this court adopted for ordering third-party visitation over a presumptively fit parent's objection under General Statutes § 46b-59. See *Roth* v. *Weston*, 259 Conn. 202, 234–35, 789 A.2d 431 (2002). Under that standard, a parent can demonstrate that posttermination visitation is necessary by showing (1) that he or she presently has a parent-child relationship with the child,[19] and (2) that "denial of the visitation will cause real and significant harm to the child. . . . [T]hat degree of harm requires more than a determination that visitation would be in the child's best interest. It must be a degree of harm analogous to the kind of harm contemplated by [General Statutes] §§ 46b-120 and 46b-129, namely, that the child is 'neglected, uncared-for or dependent.' " Id. Mindful that the statutory parent's objection to visitation is not of constitutional dimension, as was the case in *Roth* v. *Weston*, supra, 230, I would reduce the burden of proof on these elements from *Roth*'s clear and convincing burden; see id., 230–31; to a preponder-

ance of the evidence.[20]

The second step I would take is to make clear that any order of posttermination visitation will terminate *automatically* upon a court order approving an adoption agreement; notice of this potential occurrence would be incorporated into the final judgment terminating parental rights. Cf. *In re Noreen G.*, 181 Cal. App. 4th 1359, 1391–92, 105 Cal. Rptr. 3d 521 (2010) (court has no authority to order postadoption visitation), review denied, California Supreme Court, Docket No. S180958 (April 22, 2010). This rule would account for several important considerations. First, it would be consistent with the legislature's decision to sanction postadoption visitation only pursuant to a cooperative agreement, whether under the statute or common law. Second, it would remove the impediments to adoption that I identified in part I C of this opinion. Third, it would ensure that the constitutional rights of the adoptive (now legal) parents; see General Statutes § 45a-731; to decide what is in their child's best interest would be protected, shifting the burden to the former parents to prove that they can meet the *Roth* standard by clear and convincing evidence. See *People ex rel. M.M.*, supra, 726 P.2d 1125. (Court concluded that the trial court properly struck the provision in its original termination order authorizing continued visitation because the provision "could well have had the effect of depriving any future adoptive parents of full control over any decision regarding whether any contact should be allowed between [the respondent mother] and [her son] . . . . In the event [the son] is adopted, his adoptive parents will have the right to determine whether it is in his best interests to maintain contact with [the respondent mother].");  *In re Hailey ZZ.*, supra, 19 N.Y.3d 439 n.9 ("[s]urely, adoptive parents are the best arbiters of whether continued contact with the birth parent is in a child's best interests").

For the foregoing reasons, I respectfully concur.

[1] Recently, in *In re Riley B.*, 342 Conn. 333, 269 A.3d 776 (2022), this court addressed an issue left open in *In re Ava W.*, concluding that a former parent who files a motion for posttermination visitation *subsequent* to the rendering of a judgment terminating parental rights lacks a colorable claim of a direct and substantial interest in the posttermination phase of the juvenile matter to warrant the former parent's intervention as a matter of right. Id., 353.

[2] Connecticut courts have uniformly concluded that a request for visitation prior to the termination of parental rights trial is rendered moot once parental rights have been terminated. See, e.g., *In re Candace H.*, 259 Conn. 523, 526, 790 A.2d 1164 (2002); *In re Amy H.*, 56 Conn. App. 55, 61, 724 A.2d 372 (1999); *In re Victor D.*, Docket No. CP-10-007160-A, 2014 WL 7461459, *57 (Conn. Super. November 7, 2014); *In re Daniel C.*, Docket Nos. N05-JV-98-0009922-S and N05-JV-98-0009923-S, 1999 WL 558102, *1 n.2 (Conn. Super. July 22, 1999), aff'd, 63 Conn. App. 339, 776 A.2d 487 (2001); *In re Luke G.*, 40 Conn. Supp. 316, 326, 498 A.2d 1054 (1985). As one trial court aptly explained, a posttermination visitation order would be inconsistent with the judgment terminating parental rights, the purpose of which is to vest legal authority to make decisions about the children's future life and contact with others with the statutory parent. *In re Felicia B.*, Docket Nos. H13-JV-97-0005534-S and H13-JV-97-0005535-S, 1998 WL 928410, *4 (Conn. Super. December 29, 1998), aff'd, 56 Conn. App. 525, 743 A.2d 1160, cert.

denied, 252 Conn. 951, 748 A.2d 298 (2000).

[3] I use the term "former parent" rather than "biological parent," the term employed in most of the case law on this subject, because biological parent does not include adoptive parents.

[4] At common law, the right to custody and control of minor children inhered exclusively in the father; the mother could become the child's natural guardian only upon the father's death. See *Goshkarian's Appeal*, 110 Conn. 463, 466, 148 A. 379 (1930). The earliest statutes similarly contemplated appointment of a guardian for a child only when the father was incapable of caring for the child. See General Statutes (1854 Rev.) tit. VII, c. 6, § 35. It was only by statute, first enacted in 1901, that the rights of both parents were made equal. See *Goshkarian's Appeal*, supra, 466.

[5] See *Doe* v. *Doe*, 163 Conn. 340, 344, 307 A.2d 166 (1972) (noting that, when trial court rendered its decision, it did not have benefit of United States Supreme Court's decision in *Stanley* v. *Illinois*, supra, 405 U.S. 645, which held that both due process and equal protection clauses of fourteenth amendment to United States constitution required hearing on parent's fitness before his children could be taken from him); see also *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 648, 436 A.2d 290 (1980) (*Parskey, J.*, dissenting) (citing *Stanley* for proposition that "[this court] must examine the 'no ongoing parent-child relationship' ground for termination in light of the [respondent's] constitutional right to preserve her parental rights in the absence of a powerful countervailing state interest").

[6] Courts held that, "[w]hen the custody of a child has been taken from [child's] parents because [he or she] is neglected and uncared for, their consent to its adoption is not required, since they have already been fully divested of its custody and control." *Goshkarian's Appeal*, supra, 110 Conn. 469.

[7] "[I]n 1978, the [legislature] enacted General Statutes § 51-164s, which merged the Juvenile Court with the Superior Court . . . [and] vested in the Superior Court the jurisdiction that had until then resided in the Juvenile Court. . . . [A]ll juvenile matters now come under the administrative umbrella of the family division of the Superior Court." (Citations omitted; internal quotation marks omitted.) *In re Ava W.*, supra, 336 Conn. 571 n.12.

[8] To avoid the problem posed by the definition of termination of parental rights, the court in *In re Ava W.* characterizes posttermination visitation as an exercise of the court's equitable authority under § 46b-121 (b) (1) and not a *right* afforded to the parent. See *In re Ava W.*, supra, 336 Conn. 560–61. But the result is a distinction without a difference when *In re Ava W.* affords the parent the right to move for posttermination visitation and the decision to grant such visitation is assessed under a standard as elastic as "necessary or appropriate . . . ." General Statutes § 46b-121 (b) (1).

[9] The respondent parent could move to transfer the termination petition from the Probate Court to the Superior Court, but such a request must be made prior to a hearing on the merits; see General Statutes § 45a-715 (g); and hence prior to the time that the issue of posttermination visitation is likely to be contemplated in a contested case.

[10] The legislature also considered and provided for posttermination visitation for siblings. Siblings of children committed to the department have the right to file a motion and to be heard on the issue of visitation. See General Statutes §§ 17a-15 (d) and 46b-129 (q); see also General Statutes § 45a-715 (o) (allowing court to consider and order postadoption communication or contact with sibling). No similar right is expressly provided for the former parent.

[11] General Statutes § 17a-112 provides in relevant part: "(b) Either or both birth parents and an intended adoptive parent may enter into a cooperative postadoption agreement regarding communication or contact between either or both birth parents and the adopted child. Such an agreement may be entered into if: (1) The child is in the custody of the Department of Children and Families; (2) an order terminating parental rights has not yet been entered; and (3) either or both birth parents agree to a voluntary termination of parental rights, including an agreement in a case which began as an involuntary termination of parental rights. The postadoption agreement shall be applicable only to a birth parent who is a party to the agreement. Such agreement shall be in addition to those under common law. Counsel for the child and any guardian ad litem for the child may be heard on the proposed cooperative postadoption agreement. There shall be no presumption of communication or contact between the birth parents and an intended adoptive parent in the absence of a cooperative postadoption agreement.

"(c) If the Superior Court determines that the child's best interests will be served by postadoption communication or contact with either or both

birth parents, the court shall so order, stating the nature and frequency of the communication or contact. A court may grant postadoption communication or contact privileges if: (1) Each intended adoptive parent consents to the granting of communication or contact privileges; (2) the intended adoptive parent and either or both birth parents execute a cooperative agreement and file the agreement with the court; (3) consent to postadoption communication or contact is obtained from the child, if the child is at least twelve years of age; and (4) the cooperative postadoption agreement is approved by the court.

"(d) A cooperative postadoption agreement shall contain the following: (1) An acknowledgment by either or both birth parents that the termination of parental rights and the adoption is irrevocable, even if the adoptive parents do not abide by the cooperative postadoption agreement; and (2) an acknowledgment by the adoptive parents that the agreement grants either or both birth parents the right to seek to enforce the cooperative postadoption agreement.

"(e) The terms of a cooperative postadoption agreement may include the following: (1) Provision for communication between the child and either or both birth parents; (2) provision for future contact between either or both birth parents and the child or an adoptive parent; and (3) maintenance of medical history of either or both birth parents who are parties to the agreement.

"(f) The order approving a cooperative postadoption agreement shall be made part of the final order terminating parental rights. The finality of the termination of parental rights and of the adoption shall not be affected by implementation of the provisions of the postadoption agreement. Such an agreement shall not affect the ability of the adoptive parents and the child to change their residence within or outside this state.

"(g) A disagreement between the parties or litigation brought to enforce or modify the agreement shall not affect the validity of the termination of parental rights or the adoption and shall not serve as a basis for orders affecting the custody of the child. The court shall not act on a petition to change or enforce the agreement unless the petitioner had participated, or attempted to participate, in good faith in mediation or other appropriate dispute resolution proceedings to resolve the dispute and allocate any cost for such mediation or dispute resolution proceedings.

"(h) An adoptive parent, guardian ad litem for the child or the court, on its own motion, may, at any time, petition for review of any order entered pursuant to subsection (c) of this section, if the petitioner alleges that such action would be in the best interests of the child. The court may modify or terminate such orders as the court deems to be in the best interest of the adopted child. . . ."

The provisions in the Probate Court scheme for cooperative postadoption agreements mirror the provisions in § 17a-112. See General Statutes § 45a-715 (h) through (n).

[12] Let me remind the reader of the regrettable situations that warrant termination of parental rights: abandonment of the child; the parent's failure (after months of reunification efforts provided by the department) to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; the child has been denied, by reasons of an act or acts of parental commission or omission, including, but limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance, or control necessary for the child's well-being; the lack of an ongoing parent-child relationship, which means the lack of a relationship that ordinarily develops as a result of a parent's having met on a day-to-day basis the needs of the child, and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; the parent has killed, through deliberate, nonaccidental act, another child of the parent, or has requested, commanded, importuned, attempted, conspired, or solicited such killing, or has committed an assault, through deliberate, nonaccidental act, that resulted in serious bodily injury of another child of the parent; or the parent committed an act that constitutes sexual assault, as defined in our law, or has compelled a spouse or cohabitor to engage in sexual intercourse by the use of force or by the threat of the use of force, if such act resulted in the conception of the child. See General Statutes §17a-112 (j).

[13] General Statutes § 17a-112 (k) provides in relevant part: "Except in the case where termination of parental rights is based on consent, in determining

whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding . . . (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[14] Although the permanent legal guardianship may be terminated if the guardian becomes unsuitable, the parent may not move for termination. See General Statutes § 46b-129 (j) (7). The legislature's creation of the permanent legal guardianship suggests that it contemplated situations in which the parent lacks capacity to care for the child but should be permitted some ongoing contact.

[15] Even when parents are cooperative during pretermination visitation, such conduct will not necessarily be an accurate predictor of their conduct posttermination, after the incentive to cooperate to obtain reunification has been removed. Moreover, given that almost all visitation ordered prior to termination is supervised, posttermination visitation likely would also need to be supervised. It is an open question as to how such supervision would be provided, who would provide supervision, where such visits would take place, and who would assume its cost.

[16] A recent Superior Court decision exemplifies the dilemma facing trial judges as a result of this court's decision in *In re Ava W.* and the resulting consequences of posttermination visitation orders. Judge Bernadette Conway, who, until her recent retirement, had been the chief administrative judge for juvenile matters, concluded that she was obliged under the change in the law resulting from the court's holding in *In re Ava W.* and the particular circumstances of the case before her to issue an order of posttermination visitation. See *In re Roxanne F.*, Docket Nos. N05-CP-19-023890-A, N05-CP-19023891-A and N05-CP-19-023892-A, 2022 WL 375459 (Conn. Super. January 18, 2022). Judge Conway noted that, although the respondent mother and the children's paternal aunt, the identified preadoptive parent, would continue their "effective collaborative efforts" to allow for contact between the mother and the children such that no posttermination visitation order was necessary, there was the possibility that "a scenario could evolve wherein one or more of the children are adopted by someone other than [the] paternal aunt and by someone not supportive of postadoption visitation/contact between [the] respondent mother and the child[ren]." Id., *12. Because of that potential uncertainty, Judge Conway regrettably felt that she had no choice under *In re Ava. W.* but to enter a posttermination visitation order directed not only to the paternal aunt but also to any future adoptive parent. Id. Judge Conway expressed reservations about the propriety of subjecting nonparties to court orders and the court's continuing jurisdiction: "An adoptive parent's right to parent, free of unfettered outside interference, is indistinguishable from a birth parent's right to do the same. Under our state's statutory framework, prior to [*In re*] *Ava W.*, once adoption is effectuated, [department] involvement ends, and absent rare exceptions, the . . . court's jurisdiction over the child[ren] and the newly named adoptive parent(s) ceases. . . . [The] court's posttermination visitation orders necessarily [leave] intact the trial court's jurisdiction and de facto subjects the adoptive parent(s) to the court's continuing jurisdiction and court orders, until the child[ren] reach the age of majority, notwithstanding the adoptive parent's nonparty status and a lack of prior notice and opportunity to be heard prior to the issuance of the court's orders." Id., *12 n.23.

[17] The right to appointed counsel in such proceedings is not certain. Although adoptive parents *may* be entitled to appointed counsel; see General Statutes § 46b-136 (a) (authorizing appointment of "attorney to represent . . . the child's or youth's parent or parents or guardian, or other person having control of the child or youth, if such judge determines that the

interests of justice so require"); they will be assessed costs of such representation if they are not indigent. See General Statutes § 46b-136 (b).

[18] Although § 46b-121 (b) (1) is phrased in the conjunctive ("necessary or appropriate"), it seems unlikely that the legislature's intention was to make either standard a sufficient basis to issue an order in any given situation (i.e., a choice of standards). Rather, it is likely that the legislature recognized that "necessary" might be the proper standard to guide the exercise of authority in some circumstances and "appropriate" might be the proper standard in others. "Appropriate" is such a broad term that it is difficult to envision any circumstance in which the court's exercise of authority could be deemed necessary but not appropriate. By authorizing the court also to issue orders when "necessary," the legislature acknowledged that necessary should be the sole governing standard in some circumstances.

[19] The showing in connection with the first element would take into account some of the factors that the court must consider under § 17a-112 (k) to determine whether it is appropriate to terminate parental rights. See footnote 13 of this opinion.

[20] If this court is not inclined to adopt my second suggestion regarding postadoption visitation, the adoptive parent's objection to visitation would be of constitutional dimension; see General Statutes § 45a-731; and should be overcome only upon clear and convincing proof.

———————————————